Laurence ("Laird") J. Lucas (ISB #4733)
Todd C. Tucci (ISB # 6526)
ADVOCATES FOR THE WEST
P.O. Box 1612
Boise, ID 83712
(208)342-7024
llucas@advocateswest.org
ttucci@advocateswest.org

Attorneys for Plaintiff

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| WESTERN WATERSHEDS PROJECT, | No. 1:19-cv-37 |
| Plaintiff, | |
| v. | **COMPLAINT** |
| INTERIOR BOARD OF LAND APPEALS & U.S. DEPARTMENT OF THE INTERIOR, | |
| Defendants. | |

## INTRODUCTION

1.      As in the Nickel Creek litigation previously addressed by this Court, *Western Watersheds Project v. U.S. Department of Interior*, Civ. No. 08-0506-E-BLW, 2009 WL 5218020, at *8 (D. Idaho Dec. 30, 2009), Defendant Interior Board of Land Appeals (IBLA) has again overstepped its proper legal role and authority by overturning extensive scientific evidence, credibility determinations, and detailed factual findings made by a Department of Interior Administrative Law Judge (ALJ) during the course of an extensive administrative trial. Just as it did in the Nickel Creek litigation, this Court must reverse IBLA's decision.

2.      Specifically, Plaintiff Western Watersheds Project (WWP) challenges the Department of Interior's (DOI) continued unlawful authorization of ecologically destructive

livestock grazing on the Duck Creek allotment and the IBLA's decision upholding said grazing, *Bureau of Land Management v. Western Watersheds Project, et al.*, 191 IBLA 144 (September 22, 2017) (Duck Creek Decision) (copy attached hereto as Exhibit A).  The Duck Creek Decision unlawfully and arbitrarily reversed the findings of fact and conclusions of law rendered by DOI's Office of Hearings and Appeals (OHA) Administrative Law Judge James H. Heffernan in a 139-page decision (ALJ Decision) (copy attached hereto as Exhibit B).  The ALJ Decision followed a 55-day evidentiary hearing, during which WWP presented voluminous factual evidence and expert scientific testimony refuting BLM's unsound and unsupported grazing decision.  The ALJ Decision made specific credibility determinations—including regarding the expertise of WWP's expert witnesses, who followed BLM's own scientific protocols in collecting and analyzing large amounts of data regarding grazing impacts—along with detailed findings of fact in favor of WWP and against BLM.

3.     Granting BLM's appeal, the IBLA issued its Duck Creek Decision in September 2017, reversing the entirety of the ALJ Decision.  The IBLA's Duck Creek Decision utterly disregarded Judge Heffernan's witness credibility determinations, arbitrarily rejected the IBLA's own long standing precedent, applied an erroneous and insurmountable burden of proof on parties seeking to challenge BLM grazing management decisions, and is rife with legal and factual errors.

4.     As this Court observed in the prior Nickel Creek litigation, the IBLA's Duck Creek Decision essentially "re-drafted [the ALJ's] decision to turn it into a weak strawman, and then proceeded to knock it down.  The IBLA simply failed to address many of the critical points in [the ALJ's] analysis."  *WWP v. DOI*, 2009 WL 5218020, at *8.

5. The Nickel Creek, Duck Creek, and other recent IBLA grazing decisions reflect an apparent institutional bias against conservationists and in favor of ranchers, which the Court must redress by reversing the Duck Creek Decision, as it did in Nickel Creek. Moreover, the precedential impact of the Duck Creek Decision is highly damaging. Subsequent decisions from other ALJs in OHA have noted that environmental groups stand almost no chance of success in challenging BLM grazing decisions under the Duck Creek Decision precedent.

6. Plaintiff Western Watersheds Project—the nation's leading group devoted to improving grazing management through sound science and legal compliance in Idaho and across the western public lands—is directly and irreparably harmed by the IBLA's unlawful action and the damaging precedent that the Duck Creek Decision sets in allowing BLM to avoid enforcing environmental law requirements in administration of livestock grazing on public lands.

7. Accordingly, this Court must reverse and set aside the unlawful Duck Creek Decision and remand for the Department of the Interior to properly implement the ALJ Decision.

## JURISDICTION AND VENUE

8. Jurisdiction is proper in this Court under 28 U.S.C. § 1331 because this action arises under the laws of the United States, including the Federal Land Policy and Management Act, 43 U.S.C. §§ 1301 *et seq*. (FLPMA), the National Environmental Policy Act, 42 U.S.C. § 4321 *et seq*. (NEPA); the Administrative Procedure Act, 5 U.S.C. § 701 *et seq*. (APA); and the Equal Access to Justice Act, 28 U.S.C. § 2412 *et seq*. (EAJA).

9. An actual, justiciable controversy now exists between Plaintiff and Defendants. The requested relief is therefore proper under 28 U.S.C. §§ 2201–2202 and 5 U.S.C. § 701–06.

10. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(e) because Plaintiff Western Watersheds Project resides in this district, and Defendant DOI maintains offices and manages public lands in this district affected by the precedent of the Duck Creek Decision.

11. The federal government has waived sovereign immunity under 5 U.S.C. § 701.

## PARTIES

12. Plaintiff WESTERN WATERSHEDS PROJECT (WWP) is an Idaho non-profit organization, headquartered in Hailey, Idaho, with offices and staff in Boise, Idaho as well as other western states. WWP is dedicated to protecting and conserving the public lands and natural resources of watersheds in Idaho and across the American West. WWP has more than 5,000 members and supporters located throughout Idaho and the United States. WWP, as an organization and on behalf of its members, works to protect and improve wildlife, riparian areas, water quality, fisheries, and other natural resources and ecological values of watersheds throughout the West.

13. WWP's members and staff work, live, hunt, study, and/or recreate throughout the public lands administered by BLM, including the Duck Creek allotment specifically. WWP's members and staff derive aesthetic, recreational, scientific, inspirational, educational, and other benefits from these public lands on a regular and continuing basis, and intend to do so frequently in the immediate future.

14. Defendants' violations of law as alleged herein adversely and irreparably injure the aesthetic, commercial, conservational, scientific, recreational, educational, wildlife preservation, and other interests of Plaintiff and its staff and members. These are actual, concrete injuries caused by Defendants' violations of law, for which judicial relief is required to remedy the harm caused to Plaintiff.

15.     Defendant INTERIOR BOARD OF LAND APPEALS (IBLA) is a quasi-judicial appellate review body within the Department of Interior's Office of Hearings and Appeals (OHA).  Defendant IBLA exercises the delegated authority of the Secretary of the Interior to issue final decisions for DOI with respect to administrative appeals of BLM livestock grazing management decisions and other DOI decisions relating to the use and disposition of public lands and their resources.

16.     Defendant U.S. DEPARTMENT OF INTERIOR (DOI) is an agency or instrumentality of the United States, charged by law with administering the public lands, including the Duck Creek allotment.  DOI has delegated management of these lands to the BLM, but the Secretary of Interior retains ultimate management authority.

## FACTUAL ALLEGATIONS

### I.     Background

17.     The Duck Creek allotment encompasses 22,731 acres in northern Utah, including 13,090 acres of public lands, along with 8,585 acres of private lands and 1,056 acres of state lands.  The allotment historically provided vital wildlife habitat for a variety of sensitive and special status species including pygmy rabbit, short-eared owls, ferruginous hawks, and golden eagles.  It also contains crucial summer and winter range for mule deer, winter elk range, and summer range for pronghorn antelope.  Additionally, the Duck Creek allotment contains important habitat for the greater sage-grouse, including strutting and nesting areas, and areas with the potential to serve as year-round habitat.

18.     The present controversy over the Duck Creek allotment is the culmination of a 15-year saga involving extensive hearings, trial testimony, and briefing, during the course of

which destructive livestock grazing on the Duck Creek allotment has proceeded unaltered and ecological conditions on the allotment have continued to decline.

19.     As demonstrated at the evidentiary hearing, livestock grazing has substantially reduced the ecological productivity of the Duck Creek allotment.  Large amounts of bare ground exist across the allotment.  Steep slopes are devoid of native plants, infested with cheatgrass, and subject to large-scale erosion.  Heavy livestock use in riparian areas has led to nonfunctional, incised streams that have lost connection to their floodplain; heavily trampled and degraded wetlands; streams and springs lacking defined banks due to or utterly destroyed by livestock trampling; and noxious weed invasion.  Numerous livestock water developments remove water from natural sources, and some springs appear to have been completely lost as a consequence. These ecological impacts have degraded habitat for fish and wildlife.

20.     On August 6, 2004, BLM issued a final decision to modify the Duck Creek allotment grazing permits by adding fencing, water developments, vegetation treatments, and a grazing rotation system.  WWP appealed the final decision to the OHA.  That appeal was resolved through a Joint Stipulation and Settlement Agreement (2005 Agreement).

21.     As part of the 2005 Agreement, BLM was required to collect certain kinds of data—including an assessment of riparian areas and an Ecological Site Inventory (ESI)—on the Duck Creek allotment prior to preparing another decision.  The 2005 Agreement further required BLM to consult with WWP to supplement BLM's data collection as warranted.

## II.     WWP's Monitoring Data

22.     The IBLA has a longstanding rule that a party challenging BLM's reliance on the opinion of its personnel must show with "objective evidence" that "BLM erred when collecting the underlying data, when interpreting the data, or when reaching the conclusion," or that "a

demonstrably more accurate study has disclosed a contrary result." *West Cow Creek Permittees v. BLM*, 142 IBLA 224, 238 (1998).

23.     In an effort to both supplement BLM's monitoring data and fulfill IBLA's "objective evidence" burden, three scientists—Dr. John Carter, Dr. James Catlin, and Robert Edwards, a retired BLM range specialist—conducted extensive monitoring on the Duck Creek allotment from 2005 to 2008.

24.     Dr. Carter is a Ph.D. ecologist, professional consultant on western public lands ecology, and was the lead expert witness for WWP in the Nickel Creek hearing, referenced above.  Dr. Carter focuses on range management, including plant physiology and taxonomy, soils, climate, geomorphology, geology, hydrology, biology, and stream morphology.  He has extensive experience monitoring livestock grazing impacts and habitat components including vegetative cover, livestock forage use, and water quality.

25.     Dr. Catlin obtained his Ph.D. from the University of California at Berkeley with a focus on GIS and land use planning.  Dr. Catlin has extensive experience with a wide variety of scientific research methods used in natural resources management, and expertise in range ecology, wildlife biology, and wildlife management.

26.     Mr. Edwards has a Bachelor's Degree in Range Management, and spent his 30-year career working for the BLM from 1974 to 2004.  He held numerous positions within the BLM including Range Conservationist, District Program Lead for the Range and Wild Horse and Burro Program, Range Conservationist/Watershed Specialist, and Natural Resource Specialist. As a Range Conservationist, Mr. Edwards supervised nearly 30 allotments and was involved in all aspects of the Range Program including livestock use and wildlife habitat trend monitoring.

27.     Between 2005 and 2008, these three scientists collected data across the Duck Creek allotment to determine the amount of available forage ("production"), the consumption of plants, or forage, by livestock and wildlife ("utilization"), and the amount of vegetation cover. Following BLM technical reference manuals, the scientists used a modification of BLM's own monitoring protocols they deemed appropriate for gathering data on the Duck Creek allotment. The data they gathered reflected high utilization on most grazed areas of the allotment, low forage production of grasses, and significant bare ground. The results indicated that current levels of cattle grazing threatened to permanently impair the allotment. The scientists shared all of the data and their analysis with the BLM early in the planning process.

III.    **BLM's Ecological Assessment, Scoping, and NEPA Process**

28.     Following the 2005 settlement, BLM began scoping for a new EA.

29.     In July 2007, BLM issued a Draft Environmental Assessment (EA) considering the issuance of new ten-year grazing permits and an Allotment Management Plan for the Duck Creek allotment. Despite the extensive data submitted by WWP demonstrating that current grazing levels were causing ongoing damage, BLM ignored WWP's data entirely and proposed a grazing regime authorizing the same number of livestock and the same grazing season but with a new grazing rotation system and multiple new water developments (troughs).

30.     BLM used the current, degraded ecological conditions of the Duck Creek Allotment as the "environmental baseline" for the analysis in its EA. BLM thus ignored much of the grazing-related damage and degradation that had already occurred. But even after adopting degraded conditions as its baseline, BLM's own data still indicated that most of the allotment's upland habitats were damaged.

31.     BLM's NEPA analysis of the proposed decision contained numerous omissions. BLM did not analyze the impacts of the proposed grazing rotation system or water developments.  BLM did not determine the existing vegetative conditions in the areas where new troughs would be placed, nor did it consider the impacts of increased utilization and trampling within the zone surrounding the troughs.

32.     BLM also failed to take a hard look at the impacts of the proposed grazing rotation system on sage grouse.  Compared with the previously-authorized grazing system, the proposed grazing rotation concentrated four times more cattle into smaller pastures, and utilized water developments to lure cattle into previously little-used areas.  BLM did not determine the location of sage grouse nesting and brood rearing areas on the allotment, but nonetheless claimed that there would be no significant impact to sage grouse.  This determination was not supported by facts or data.

33.     BLM did not analyze the cumulative impacts of range improvement projects— such as fences, water troughs, water pipelines, and vegetation treatments—on the private and state lands within and surrounding the Duck Creek allotment.  These private and state lands are contiguous with the Duck Creek allotment, and thus development on those lands must be considered in any cumulative impacts analysis.

34.     BLM did not consider a reasonable range of alternatives to the proposed action. BLM's EA meaningfully analyzed only two alternatives: the Proposed Action and one other, known as Alternative A.  Both alternatives were very similar to the prior grazing system, which had already damaged and degraded wildlife habitat across the allotment.

35.     Despite well-documented significant environmental impacts from grazing on the Duck Creek allotment, BLM determined that continued grazing would not have "significant"

impacts.  BLM did not update the carrying capacity assessment for the allotment, rejected supplementary information provided by WWP, and instead relied on the existing carrying capacity analysis which was over 30 years old.

36.     Throughout the NEPA process, BLM consistently favored ranching interests and attempted to exclude environmental interests, including WWP and its experts.  BLM regularly attended meetings about the Duck Creek Allotment conducted by the Rich County Coordinated Resource Management (CRM), a group composed of permittees and other pro-ranching parties.

37.     In order for Drs. Carter and Catlin and Mr. Edwards to participate in the public process for the Duck Creek project, they had to attend the CRM monthly meetings.  BLM did not conduct the CRM meetings, did not notify the public about them, and did not take meeting notes or attendance records.

38.     At the administrative trial, BLM testified that a public scoping meeting for the Duck Creek EA was conducted on June 2, 2006, at a CRM meeting.  The meeting was conducted by the CRM.  The CRM sent notification of the meeting to its members, but there is no evidence that such notice was sent to WWP's representative, Dr. John Carter, who had actively participated in management of the Duck Creek allotment since 2001.

39.     During the scoping meeting, BLM presented a comparison of their own data with the data gathered by Drs. Carter and Catlin and Mr. Edwards.  BLM did this comparison of the data results without telling Drs. Carter and Catlin or Mr. Edwards beforehand, and without consultation, coordination or cooperation with them when preparing the presentation.

40.     WWP submitted comments on the draft EA, raising concerns about the rejection of WWP's data and scientific literature and the lack of collaboration on the part of BLM and the CRM.

41.     BLM's Notice of Proposed Decision was issued on May 29, 2008.  WWP administratively protested the proposed decision.  A final decision and accompanying EA were issued on September 12, 2008.

42.     The final decision reauthorized status-quo grazing on the allotment, as well as numerous new livestock water developments.  BLM did not use any of WWP's data or analysis in reaching its final decision.

43.     On October 28, 2008, WWP appealed the 2008 final decision to the OHA.

**IV.     Proceedings Before the Office of Hearings and Appeals**

44.     OHA Administrative Law Judge Heffernan conducted an evidentiary hearing on WWP's appeal over the course of 55 non-consecutive days between June 8, 2009 and July 28, 2011.  The hearing generated a 15,639-page transcript and 375 exhibits.  At the time, it was the longest hearing in the history of OHA.

45.     During the hearing, Dr. Carter, Dr. Catlin, and Mr. Edwards testified in detail about their monitoring efforts, their protocols, and their results.  Dr. Catlin was on the stand for 25 days and Dr. Carter was on the stand for 11 days, giving Judge Heffernan extensive opportunity to determine their veracity, credibility and qualifications.

46.     In May 2013, Judge Heffernan issued his 139-page ALJ Decision (Attachment B) replete with evidentiary and witness credibility determinations, findings of fact and conclusions of law.  His opinion demonstrated a firm grasp of the science underlying the relevant monitoring methodologies, the analysis of the data, and the conclusions reached.  His opinion also devoted substantial findings to witness credibility determinations—something Judge Heffernan, as the trier of fact, was in the best position to make.

47.     In the ALJ Decision, Judge Heffernan found that both Drs. Carter and Catlin had "several years of on-the-job, on-the-ground, training conducting their extensive monitoring on the allotment, and, in my opinion, their testimony is credible with respect to the conditions on the allotment, particularly in the time frame post-2005, the year in which BLM conducted most of its monitoring." *See* Attachment B, pp. 22.  Based on these and other findings, and considering all the hearing evidence, Judge Heffernan specifically held that the testimony of Drs. Carter and Catlin was entitled "to receive reasonable deference."  *Id.*

48.     In contrast, Judge Heffernan found the testimony of BLM's staff at the hearing to be "at various times notably uninformed, inconsistent, and contradictory."  *Id.*

49.     Judge Heffernan ruled in favor of WWP on almost all its claims.  He reversed BLM's 2008 final decision because the data collected by WWP's experts, which he found credible based upon many days of testimony, showed (among other things) excessive utilization and a significant loss of grass productivity across the allotment caused by cattle and sheep grazing.

50.     Judge Heffernan concluded that BLM violated NEPA in several ways, including by:

a.  Improperly rejecting all of WWP's data;

b.  Failing to analyze a reasonable range of alternatives including a no-grazing or reduced-grazing alternative;

c.  Failing to analyze the cumulative impacts of activities on the permittees' private lands;

d.  Failing to determine the actual livestock use occurring on the allotment under the prior permit;

e.   Failing to adequately analyze impacts of the proposed decision on sage-grouse;

f.   Failing to take the requisite "hard look" at the baseline condition of the allotment's vegetation composition, particularly the loss of grasses;

g.   Failing to analyze the impacts of major changes to Ecological Site Descriptions for the allotment; and

h.   Relying upon an antiquated carrying capacity analysis.

51.   Judge Heffernan also concluded that BLM violated FLPMA and its implementing regulations in numerous respects, including by:

a.   Failing to include enforceable terms and conditions in grazing permits to ensure compliance with the Fundamentals of Rangeland Health regulations, 43 C.F.R. Subpart 4180;

b.   Failing to comply with the regulatory requirement for consultation, cooperation, and coordination; and

c.   Failing to meet the Desired Species Standard of the Utah Standards for Rangeland Health as it applies to wildlife species and their habitats.

52.   Judge Heffernan further held that BLM's use of third-party meetings with ranching interests hostile to WWP, *i.e.,* the CRM, to conduct the public scoping for the Duck Creek EA "constituted a deprivation of basic procedural due process for WWP."  *See* Attachment B, pp. 13.

53.   However, Judge Heffernan denied WWP's request to adopt any particular remedies to ensure that BLM's efforts on remand fully complied with its obligations under NEPA and FLPMA.  Rather, he simply reversed and remanded BLM's decision.

## V.        Proceedings Before the Interior Board of Land Appeals

54.        WWP and BLM separately appealed to the IBLA from the ALJ Decision.  BLM
challenged each of Judge Heffernan's holdings, as well as his reversal of BLM's decision.
WWP appealed Judge Heffernan's remedies determination.

55.        On August 15, 2013, IBLA granted BLM's petition to stay the effect of the ALJ
Decision pending resolution of the appeal, allowing grazing to continue on the allotment under
the BLM's 2008 final decision.  Both BLM and WWP filed extensive briefing before IBLA.

56.        After more than four years of delay, IBLA issued its Duck Creek Decision on
September 22, 2017, reversing all of Judge Heffernan's rulings and upholding BLM's 2008 final
decision and EA.  The IBLA's Duck Creek Decision consistently misrepresented or ignored the
facts, misconstrued the law, mischaracterized holdings from ALJ Heffernan's Decision, and
ignored precedent, particularly with regard to witness credibility determinations made by the
trier of fact.

57.        As this Court previously held in reversing the similar IBLA Nickel Creek
decision, the IBLA has recognized the propriety of deferring to the ALJ's findings "where a
witness' demeanor affects his credibility." *Nickel Creek*, 2009 WL 5218020, at *6, quoting
*United States v. Dunbar Stone Co.*, 56 IBLA 61, 67 (1981).  "In these circumstances, where 'the
resolution of disputed facts is clearly premised upon an ALJ's finding of credibility, which are in
turn based upon the judge's reaction to the demeanor of the witnesses, and such findings are
supported by substantial evidence, they ordinarily will not be disturbed by the Board.'"  *Id*.
(quoting *BLM v. Carlo*, 133 IBLA 206, 211 (1995)).

58.        Utterly disregarding this Court's holdings from the Nickel Creek decision and the
legal precedents it cited, the IBLA's Duck Creek Decision wrongly rejected Judge Heffernan's

witness credibility determinations.  The IBLA summarily and falsely held that Judge Heffernan

had not addressed WWP's witnesses' credentials or training, and instead characterized their

testimony as merely "personal observations."  Duck Creek Decision (Attachment A), 191 IBLA

at 192.  Additionally, the IBLA decision made no determination regarding the credibility of Mr.

Edwards' testimony.

59.     Without citing any regulation or case law in support, IBLA approved BLM's

complete rejection of WWP's monitoring data because it was not the same kind, and did not

reach the same results, as BLM's own data.

60.     IBLA's Duck Creek Decision also applied an erroneous and insurmountable

burden of proof to NEPA challenges.  As noted above, the IBLA has long followed the rule that

a party challenging BLM's reliance on the opinion of its personnel must show with "objective

evidence" that "BLM erred when collecting the underlying data, when interpreting the data, or

when reaching the conclusion," or that "a demonstrably more accurate study has disclosed a

contrary result."  *West Cow Creek Permittees v. BLM*, 142 IBLA 224, 238 (1998).  WWP relied

on that IBLA case law in collecting information for the Duck Creek allotment.  Yet IBLA

arbitrarily and capriciously disregarded that long-standing precedent in issuing the Duck Creek

Decision.

61.     Rather than provide a reasoned and justified basis for changing its applicable

standards of review, the IBLA in the Duck Creek Decision cited a regulation applicable only to

disputes over "grazing preference," 43 C.F.R § 4.480, and held that BLM decisions must be

upheld unless they are "not supported on any rational basis."  Duck Creek Decision, 191 IBLA at

151.  But "grazing preference," a "superior or priority position against others for the purpose of

receiving a grazing permit or lease," 43 C.F.R. § 4100.0-5, was not at issue in this case.

62.     Subsequent OHA decisions have identified this error, noting that "the regulation refers to BLM's 'adjudication of grazing *preference*' while the IBLA's oft-cited formulation . . . does not quote that exactly, but refers to BLM's 'adjudication of grazing *privileges*.'  The Board's interpretation thus arguably extends the import of this rule beyond its original intent." *Western Watersheds Project v. BLM,* NV-06-17-002, Appellants' Motions for Summary Judgment Denied, BLM's Motion for Summary Judgment Granted, 10 (OHA, February 12, 2018) (emphasis in original).  *See also Yellowstone to Uintas Connection v. BLM*, UT-W010-15-1, Motions for Summary Judgment Denied, at n. 4 (OHA, November 30, 2017).

63.     IBLA further asserted that BLM's witnesses and their conclusions are entitled to "added deference" but cited no regulations or case law as support.  Duck Creek Decision*,* 191 IBLA at 152.

64.     IBLA wildly mischaracterized Judge Heffernan's holdings, record evidence, and hearing testimony regarding, among other things, the sufficiency of BLM's public scoping meeting, the results of BLM's own data, and the effect of BLM's adoption of new ecological site descriptions (ESDs) effectively setting baseline conditions as an already degraded ecological state.

## VI.     OHA and IBLA Decisions After Duck Creek

65.     Both OHA and IBLA have since used the Duck Creek Decision to apply an improper level of deference to BLM and its experts, arbitrarily and capriciously changing the prior standards applied by IBLA.  *E.g.*, *S. Nevada Water Authority v. BLM*, 191 IBLA 382, 403 (October 13, 2017) (citing Duck Creek Decision).

66.     Indeed, one recent OHA opinion explained that the Duck Creek Decision poses a nearly complete bar to prevailing before IBLA for conservation appellants, noting that although

the appellants raised sufficient potential genuine issues of material fact, there was little point in

appellants pursuing a hearing because, "[a]s the parties are aware, a party appealing a BLM

grazing decision must carry an extremely high burden, as underscored by recent decisions of the

IBLA. This is apparently so even when an appellant produces its own extensive firsthand

monitoring data on an allotment. . . . the Appellants here should be aware that the Duck Creek

case [does] not bode well for [their] ultimate chances of prevailing before the [Interior Board of

Land Appeals], regardless of the outcome in the Hearings Division." *Yellowstone to Uintas*

*Connection v. BLM*, UT-W010-15-1, Motions for Summary Judgment Denied, at 16–17 (OHA,

November 30, 2017) (emphasis added).

**FIRST CAUSE OF ACTION:**
**DUCK CREEK DECISION IS ARBITRARY, CAPRICIOUS, CONTRARY TO**
**LAW, AND NOT SUPPORTED BY SUBSTANTIAL EVIDENCE**

67.     Plaintiff realleges and incorporates by reference the preceding paragraphs.

68.     Plaintiff challenges the IBLA's September 2017 Duck Creek Decision as being

arbitrary, capricious, not supported by substantial evidence, an abuse of discretion, and otherwise

not in accordance with law in its reversal of Judge Heffernan's May 2013 Decision.  This claim

is brought pursuant to the judicial review provisions of the APA, 5 U.S.C. § 706(2)(A) and (E).

69.     Judicial review and reversal of an IBLA decision is appropriate when the IBLA

did not base its decision on a consideration of the relevant factors or where the record does not

contain "such relevant evidence as a reasonable mind might accept as adequate to support a

conclusion." *Hjelvik v. Babbit*, 198 F.3d 1072, 1074 (9th Cir. 1999) (*citing Drouin v. Sullivan*,

966 F.2d 1255, 1257 (9th Cir. 1992)).

70.    The IBLA's Duck Creek Decision is arbitrary, capricious, not supported by substantial evidence, an abuse of discretion, and otherwise not in accordance with law for numerous reasons, including but not limited to:

       a.    Arbitrarily and capriciously rejecting its prior decisions, including West Cow Camp Permittees, and substituting a new and impossible standard without justification or explanation;

       b.    Inappropriately overturning expert witness credibility determinations, and findings of fact based upon those credibility determinations;

       c.    Articulating a novel, erroneous, and insurmountable burden of proof;

       d.    Upholding BLM's decision to reject the third-party data submitted during the NEPA process because it was not of the same type—and did not arrive at the same conclusions—as the agency's data;

       e.    Finding that BLM is not required to impose mandatory, enforceable, terms and conditions in grazing permits; and/or

       f.    Substantially mischaracterizing Judge Heffernan's holdings, record evidence, and hearing testimony.

## SECOND CAUSE OF ACTION:
## VIOLATIONS OF NEPA

71.    Plaintiff realleges and incorporates by reference the preceding paragraphs.

72.    This Second Cause of Action challenges Defendants' violations of the National Environmental Policy Act, 42 U.S.C. §§ 4321 et seq. and NEPA's implementing regulations in approving the Duck Creek Final Decision based on:

       a.   Biased public scoping procedures and insufficient notice;

       b.   Failure to properly analyze the environmental baseline conditions;

    c.   Failure to take a hard look at all direct, indirect, and cumulative impacts of the proposed action on the allotment;

    d.   Failure to analyze a reasonable range of alternatives; and

    e.   Failure to prepare an EIS.

This claim is brought pursuant to the judicial review provisions of the APA, 5 U.S.C. § 706.

73.    NEPA requires all federal agencies to undertake a thorough and public analysis of the environmental consequences of proposed federal actions, including a detailed EIS for all "major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C). Such analysis must include consideration of a reasonable range of alternatives to a proposed action. 42 U.S.C. § 4332(2)(C)(iii) (alternatives); *see also* 40 C.F.R. § 1502.14 (alternatives including the proposed action). NEPA also requires analyses of the likely direct, indirect, and cumulative environmental impacts of a proposed action. 40 C.F.R. §§ 1508.7; 1508.25(a)(2).

74.    NEPA's policy is to "[e]ncourage and facilitate public involvement in decisions which affect the quality of the human environment." 40 C.F.R. §1500.2(d). The regulations state that "[a]gencies shall: (a) Make diligent efforts to involve the public in preparing and implementing their NEPA procedures [and] (b) Provide public notice of NEPA-related hearings, public meetings, and the availability of environmental documents so as to inform those persons and agencies who may be interested or affected." 40 C.F.R. §1506.6. "Agencies shall hold or sponsor public hearings or public meetings whenever appropriate or in accordance with statutory requirements applicable to the agency. Criteria shall include whether there is: (1) Substantial environmental controversy concerning the proposed action or substantial interest in holding the hearing." 40 C.F.R. §1506.6(c)(1).

75.     By reversing the ALJ Decision and reinstating the 2008 BLM decision authorizing grazing on the Duck Creek allotment, the IBLA Decision acted as the final decision of DOI and approved the 2008 BLM decision in violation of NEPA and the APA.

76.     Defendants' failure or refusal to undertake lawful and proper environmental review as required by NEPA is arbitrary, capricious, an abuse of discretion, not in accordance with law, and has caused or threatens serious prejudice and injury to the rights and interests of WWP's members.

WHEREFORE, Plaintiff prays for relief as set forth below.

## THIRD CAUSE OF ACTION:
## VIOLATION OF FLPMA

77.     Plaintiff realleges and incorporates by reference the preceding paragraphs.

78.     This Third Cause of Action challenges Defendants' violation of the Federal Land Policy and Management Act, 43 U.S.C. § 1701 et seq., and its implementing regulations. Defendants violated FLPMA by:

a.  Preparing the Allotment Management Plan and grazing permit without "careful and considered consultation, cooperation and coordination" with WWP;

b.  Authorizing livestock use in excess of the carrying capacity of the allotment and ignoring updated information;

This claim is brought pursuant to the judicial review provisions of the APA, 5 U.S.C. § 706.

79.     FLPMA governs the management of the federal public lands by the BLM. FLPMA provides that BLM must develop land use plans for the public lands under its control. 43 U.S.C. § 1712.  All resource management decisions made by BLM must conform to the approved land use plan.  43 C.F.R. § 1610.5-3(a).

80.     FLPMA's implementing regulations also require BLM to facilitate public involvement by requiring the agency to "provide opportunity for public participation in the planning and environmental analysis of proposed [Allotment Management] plans affecting the administration of grazing..."  43 C.F.R. § 4120.2(c).  In addition, when issuing grazing permits, BLM must consult, cooperate and coordinate with interested publics.  43 C.F.R. §§ 4120.2(a), 4130.2(b).  FLPMA requires that "[t]he authorized livestock grazing use shall not exceed the livestock carrying capacity of the allotment."  43 C.F.R. § 4130.3-1(a).  The applicable land use plan, the 1980 Randolph Management Framework Plan, requires that the "Carrying capacities for each allotment will be based upon the forage production on suitable acreage in each allotment."

81.     By reversing the ALJ Decision and reinstating the 2008 BLM decision authorizing grazing on the Duck Creek allotment, the IBLA Decision acted as the final decision of DOI and approved the 2008 BLM decision in violation of FLPMA and the APA.

82.     DOI's failure or refusal to adhere to FLPMA and its implementing regulations is arbitrary, capricious, an abuse of discretion, not in accordance with law, and has caused or threatens serious prejudice and injury to the rights and interests of Plaintiff's members.

WHEREFORE, Plaintiff prays for relief as set forth below.

## PRAYER FOR RELIEF

Wherefore, Plaintiff respectfully requests that the Court grant the following relief:

A.     Reverse and vacate IBLA's September 22, 2017 Duck Creek Decision;

B.     Reinstate ALJ Heffernan's May 16, 2013 Decision;

C.     Remand to DOI with instructions to issue new decision consistent with the ALJ Decision by a date certain;

D.      Grant such preliminary or permanent injunctive relief as Plaintiff may hereafter seek;

E.      Award Plaintiff its reasonable costs, litigation expenses, and attorney's fees associated with this litigation and the related administrative proceedings pursuant to the Equal Access to Justice Act, 28 U.S.C. § 2412 et seq., and/or all other applicable authorities; and/or

F.      Grant such further relief as the Court deems necessary or appropriate to redress Defendant's legal violations and protect the public lands and resources of the Duck Creek allotment from further degradation.

Dated this 29th day of January, 2019.       Respectfully submitted,

*/s/ Laurence ("Laird") J. Lucas*
Laurence ("Laird") J. Lucas (ISB #4733)
Todd C. Tucci (ISB # 6526)
ADVOCATES FOR THE WEST
P.O. Box 1612
Boise, ID 83712
(208)342-7024
llucas@advocateswest.org
ttucci@advocateswest.org

Attorneys for Plaintiff