Laurence ("Laird") J. Lucas (ISB #4733) *Pro hac vice*
ADVOCATES FOR THE WEST
P.O. Box 1612
Boise, ID 83712
(208) 342-7024
llucas@advocateswest.org

Megan Backsen (ISB #10490) *Pro hac vice*
20 S. Wheeler St.,
Boise, ID 83705
(719) 207-2493
meganbacksen@gmail.com

Attorneys for Plaintiff

Joel Ban (UT Bar # 10114)
Ban Law Office P.C.
P.O. Box 118
Salt Lake City, UT 84110
Tel: (801) 532-2447
joel@banlawoffice.com

Local Counsel

## IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF UTAH, NORTHERN DIVISION

| | |
|---|---|
| WESTERN WATERSHEDS PROJECT, | No. 1:19-cv-00095-TS-PMW |
| Plaintiff, | |
| v. | **PLAINTIFF'S OPENING BRIEF** |
| INTERIOR BOARD OF LAND APPEALS & U.S. DEPARTMENT OF THE INTERIOR, | |
| Defendants. | |

# TABLE OF CONTENTS

JURISDICTIONAL STATEMENT……………………………………………………………1

STATEMENT OF ISSUES FOR REVIEW……………………………………………………1

STATEMENT OF THE CASE……………………………………………………………………2

    Statutory Background for Grazing on Public Lands………………………………………..2

    BLM Grazing Regulations……………………………………………………………….4

    Background on Duck Creek Allotment……………………………………………………5

    DCA Monitoring………………………………………………………………………….7

    NEPA Process for 2008 Decision………………………………………………………..8

    Proceedings Before ALJ Heffernan……………………………………………………11

    Proceedings Before the IBLA……………………………………………………………15

SUMMARY OF THE ARGUMENT………………………………………………………15

ARGUMENT…………………………………………………………………………………16

    I.    STANDARDS OF REVIEW………………………………………………………16

        A.    IBLA Standards of Review…………………………………………………16

        B.    Judicial Standards of Review………………………………………………17

    II.  THE IBLA APPLIED INCORRECT LEGAL STANDARDS…………………………19

        A.    The IBLA Wrongly Applied the TGA………………………………………...19

        B.    The IBLA Improperly Overrode NEPA's Standards……………………………21

    III. THE IBLA ARBITRARILY FAILED TO FOLLOW ITS OWN RULE REQUIRING SUBSTANTIAL DEFERENCE TO AN ALJ'S FACTUAL FINDINGS………………23

    IV. THE IBLA DECISION WAS ARBITRARY AND CAPRICIOUS, AND NOT SUPPORTED BY SUBSTANTIAL EVIDENCE, IN REVERSING KEY FINDINGS AND CONCLUSIONS OF THE ALJ……………………………………………………...24

        A.    The IBLA Mischaracterized WWP's Evidence and the ALJ's Findings………..25

B.      BLM's Biased Decision-Making……………………………………………..26

C.      Expertise and Credibility of WWP and BLM Witnesses…………………..28

D.      Rangeland Conditions and Monitoring…………………………………….30

V.   THE IBLA VIOLATED NEPA AND THE APA IN REVERSING ALJ HEFFERNAN AND UPHOLDING BLM'S 2008 EA……………………………………………30

A.      Baseline Conditions………………………………………………………...31

B.      Sage-Grouse …………………………………………………………………32

C.      Utah Standard 3…………………………………………………………….37

D.      Upland Impacts……………………………………………………………..39

E.      Cumulative Impacts………………………………………………………...41

F.      Range of Alternatives………………………………………………………42

VI. WWP IS SEVERELY PREJUDICED BY THE IBLA DECISION……………………44

CONCLUSION…………………………………………………………………44

CERTIFICATE OF COMPLIANCE…………………………………………………45

CERTIFICATE OF SERVICE………………………………………………………..46

# TABLE OF AUTHORITIES

**Cases**

*Baltimore Gas & Elec. Co. v. Natural Res. Defense Council*, 462 U.S. 87 (1983)…………..22, 30

*Big Horn Coal Co. v. Temple*, 793 F.2d 1165, 1169 (10th Cir. 1986)…………………..19, 24, 29

*Bowman Transp. v. Arkansas–Best Freight Sys.*, 419 U.S. 281, 284 n. 2 (1974)………………27

*Calvert Cliffs' Coord. Comm. v. AEC*, 449 F.2d 1109, 1112 (1971)……………………………..2

*Colo. Wild v. U.S. Forest Serv.*, 435 F.3d 1204, 1213 (10th Cir. 2006)…………………….18, 36

*Committee to Preserve Boomer Lake Park v. Dept. of Transportation*, 4 F.3d 1543, 1553 (10th Cir. 1993)……………………………………………………………………………………23, 31

*Foust v. Lujan,* 942 F.2d 712, 714 (10th Cir. 1991)……………………………………...18, 26-27

*Fuel Safe Washington v. F.E.R.C.*, 389 F.3d 1313, 1331 (10th Cir. 2004)……………………...41

*Hoyl v. Babbitt*, 129 F.3d 1377, 1384 (10th Cir. 1997)…………………………………………...18, 24

*Idaho Power Co. v. FERC*, 801 F.3d 1055, 1058 (9th Cir. 2015)………………………………19

*Idaho Watersheds Project v. Hahn,* 187 F.2d 1035 (9th Cir. 1999)………………………………4

*Illinois Cent. R.R. Co. v. Norfolk & Western Ry.,* 385 U.S. 57, 66 (1966)………………………18

*IMC Kalium Carlsbad, Inc. v. Interior Bd. of Land Appeals*, 206 F.3d 1003, 1009 (10th Cir. 2000)…………………………………………………………………………………16-17

*Lujan v. Defenders of Wildlife*, 504 U.S. 555, 562–65 (1992)……………………………….7, n2

*Metcalf v. Daley*, 214 F.3d 1135 (9th Cir. 2000)………………………………………………...42

*Midwestern Transp., Inc. v. Interstate Commerce Comm'n,* 635 F.2d 771 (10th Cir.1980)…….19

*New Mexico ex rel. Richardson v. Bureau of Land Mgmt.*, 565 F.3d 683 (10th Cir. 2009)…18, 31

*NRDC v. Hodel,* 618 F. Supp. 848, 855 (E.D. Cal. 1985)……………………………………2-3

*NRDC v. Morton*, 388 F. Supp. 829 (D.D.C. 1974), *aff'd*, 527 F.2d 1386 (D.C. Cir. 1976)……..3

*Olenhouse v. Commodity Credit Corp.,* 42 F.3d 1560, 1576 (10th Cir. 1994)…………18, 24, 27

*Pennaco Energy, Inc. v. U.S. Dep't of Interior*, 377 F.3d 1147 (10th Cir. 2004)……………….17

*Public Lands Council v. Babbitt,* 529 U.S. 728, 731–32 (2000)……………………………..2-4

*United Steel Workers of America v. NLRB,* 482 F.3d 1112, 1117 (9th Cir.2007)………………29

*Utah Shared Access Alliance v. U.S. Forest Service*, 288 F.3d 1205, (10th Cir. 2002)…22-23, 31

*Utahns for Better Transp. v. U.S. Dep't of Transp.*, 305 F.3d 1152, 1172–73 (10th Cir. 2002), *as modified on reh'g,* 319 F.3d 1207 (10th Cir. 2003)…………………………………….41, 43

*Vermont Yankee Nuclear Power Corp. v. NRDC*, 435 U.S. 519, 553 (1978)………………22, 30

*Western Watersheds Project v. Kraayenbrink*, 632 F.3d 472, 476 (9th Cir. 2010), *cert. denied* S. Ct. No. 10-1290 (Oct. 3, 2011)…………………………………………………4-5

*Western Watersheds Project v. Salazar*, 843 F.Supp.2d 1105, 1128–30 (D. Idaho 2012)……4, 35

*Western Watersheds Project v. U.S. Dept. of Interior*, No. 08-0506-E-BLW, 2009 WL 5218020 (D. Idaho 2009)……………………………………………………..16, 26, 30

**Statutes**

5 U.S.C. §§ 701–706………………………………………………………………………1

5 U.S.C. § 706(2)(A) & (D)………………………………………………………17-18, 21

28 U.S.C. § 1331…………………………………………………………………………1

42 U.S.C. § 4321 *et seq*………………………………………………………...1, passim

43 U.S.C. § 315b…………………………………………………………………..2, 19-20

43 U.S.C. § 1701 *et seq*………………………………………………………………1-3

**Regulations**

40 C.F.R. § 1502.14……………………………………………………………..3, 42

40 C.F.R. § 1508.25……………………………………………………………………3

40 C.F.R. § 1508.7…………………………………………………………………..3

40 C.F.R. § 1508.9(b)………………………………………………………………42

43 C.F.R. § 4.1…………………………………………………………………...16

43 C.F.R. § 4.474–.478……………………………………………………...16

43 C.F.R. § 4.480……………………………………………………………...20

43 C.F.R. Part 4100…………………………………………………………….4

43 C.F.R. § 4100.0-5………………………………………………………...20

**Other Authorities**

*BLM v. Carlo*, 133 IBLA 206, 211 (1995)…………………………………………17

*Bureau of Land Management v. Western Watersheds Project,* 191 IBLA 144 (2017)…..1, passim

*Nat'l Wildlife Fed'n v. BLM*, 140 IBLA 85 (1997)…………………………………...16

*U.S. v. Dunbar Stone Co.*, 56 IBLA 61, 68 (1981)…………………………………...16, 23

*U.S. v. Miller*, 165 IBLA 342, 377 (2005)……………………………………...17, 23

*U.S. v. Rannells*, 175 IBLA 363, 383 (2008)……………………………………...17, 23

*United States v. Whittaker*, 95 IBLA 271, 286 (1987)………………………………...17

*Yankee Gulch Joint Venture v. BLM*, 113 IBLA 106, 136 (1990)………………………17

## JURISDICTIONAL STATEMENT

Plaintiff Western Watersheds Project (WWP) challenges the September 2017 decision of the Interior Board of Land Appeals (IBLA), *Bureau of Land Mgmt. v. W. Watersheds Project,* 191 IBLA 144 (2017) (AR010527-659; Attachment A hereto), which reversed the May 2013 decision of Administrative Law Judge (ALJ) James Heffernan of the Department of Interior (DOI) Office of Hearings and Appeals (OHA) (AR027035-174; Attachment B hereto) and upheld the 2008 Environmental Assessment (EA), Finding of No Significant Impact (FONSI), and Final Decision issued by the Bureau of Land Management (BLM) for the Duck Creek allotment (AR020741–892).

WWP contends the IBLA Decision was arbitrary and capricious, an abuse of discretion, not supported by substantial evidence, and/or are not in accordance with law under the National Environmental Policy Act (NEPA), 42 U.S.C. § 4321 *et seq.*, the Federal Land Management and Policy Act (FLPMA), 43 U.S.C. § 1701 *et seq.*, their implementing regulations, and the Administrative Procedure Act (APA), 5 U.S.C. §§ 701–706. This Court has jurisdiction pursuant to the APA and 28 U.S.C. § 1331.

## STATEMENT OF ISSUES FOR REVIEW

Through the 2008 EA and Decision, BLM authorized ecologically destructive public lands livestock grazing on the Duck Creek allotment in Rich County, Utah without taking the required NEPA "hard look" at environmental conditions, impacts, or alternatives. Based on evidence presented in a 55-day evidentiary hearing, ALJ Heffernan found that BLM violated NEPA and BLM's regulations in numerous respects, supported by findings of fact, witness credibility determinations, and conclusions of law applying IBLA and federal court precedents.

WWP'S OPENING BRIEF --                    1

In reversing the ALJ Decision, the IBLA upheld BLM's EA and Decision and allowed continued destructive grazing to continue. The IBLA Decision itself must be reversed, and BLM's EA and Decision held unlawful, because:

1.     The IBLA erroneously applied legal standards for adjudicating "grazing preferences" under the Taylor Grazing Act (TGA) to reject WWP's challenges under NEPA, which does not impose the heavy burden of proof required by the IBLA;

2.     The IBLA arbitrarily and capriciously failed to follow its own precedents giving substantial deference to ALJ findings of fact and credibility determinations supported by substantial evidence; and/or

3.     The IBLA wrongly reversed the ALJ's findings and conclusions, who correctly held that the 2008 EA violated NEPA in multiple respects, including failing to take a "hard look" at baseline conditions, direct and cumulative impacts, or a reasonable range of alternatives.

### STATEMENT OF THE CASE

**Statutory Background for Grazing on Public Lands**

Until 1934, the public rangelands were unregulated, allowing severe overgrazing that culminated in the Dust Bowl era. *See Pub. Lands Council v. Babbitt,* 529 U.S. 728, 731–32 (2000); *Natural Res. Def. Council v. Hodel,* 618 F. Supp. 848, 855 (E.D. Cal. 1985) (describing history of grazing on public lands). Congress enacted the TGA to preserve the lands and their resources from injury due to overgrazing, requiring federal permits to authorize livestock grazing on the public lands. 43 U.S.C. § 315b; *Babbitt*, 529 U.S. at 733.

In 1970, Congress enacted NEPA to make environmental protection part of the mandate of every federal agency. *See Calvert Cliffs' Coordinating Comm. v. U.S. Atomic Energy Comm.,*

449 F.2d 1109, 1112 (1971). NEPA and its implementing regulations require federal agencies to undertake a thorough and public analysis of the environmental consequences of proposed federal actions, including direct, indirect, and cumulative impacts, and a reasonable range of alternatives. *See* 42 U.S.C. § 4332(2)(C); 40 C.F.R. §§ 1502.14, 1508.7, 1508.25(a)(2). In *Natural Res. Def. Council v. Morton*, 388 F. Supp. 829 (D.D.C. 1974), *aff'd*, 527 F.2d 1386 (D.C. Cir. 1976), the federal courts held BLM must conduct site-specific NEPA analysis for grazing authorizations.

Congress enacted FLPMA in 1976, partially in response to studies revealing that public rangelands remained degraded despite regulation under the TGA. *See Hodel,* 618 F. Supp. at 857 (citing reports); 43 U.S.C. § 1751(b)(1) (FLPMA finding "that a substantial amount of the Federal range lands is deteriorating in quality"). FLPMA directs the Secretary of Interior to manage public lands under principles of multiple use and sustained yield; to protect their ecological, environmental, and other values; and to provide food and habitat for fish and wildlife, as well as outdoor recreation and human use. 43 U.S.C. §§ 1701(a)(8), 1732(a). It requires the Secretary to adopt land use plans to fulfill these values, and ensure that activities on the public lands do not cause unnecessary or undue degradation. *Id.* § 1732(a) & (b). Grazing permits must also contain terms and conditions to meet FLPMA's requirements and goals. *Id.,* § 1752(a).

Two years after FLPMA, Congress adopted the Public Rangelands Improvement Act (PRIA), 43 U.S.C. § 1901 *et seq.* PRIA found that "vast segments of the public rangelands are producing less than their potential" and "are in an unsatisfactory condition." *Id.* § 1901(a)(1) & (3). PRIA thus committed to "manage, maintain and improve the condition of the public rangelands," in accordance with FLPMA. *Id.,* § 1901(b)(2).

**BLM Grazing Regulations.**

Under these statutes, BLM has adopted regulations for its livestock grazing management on over 160 million acres of public lands in the American West. *See* 43 C.F.R. Part 4100; *W. Watersheds Project v. Kraayenbrink*, 632 F.3d 472, 476 (9th Cir. 2010), *cert. denied* S. Ct. No. 10-1290 (Oct. 3, 2011) (discussing BLM grazing regulations)*.*

BLM comprehensively revised its grazing regulations in 1995 to address problems of continued overgrazing. *Kraayenbrink*, 632 F.3d at 478. The 1995 regulations expanded public involvement in BLM grazing decisions, and "place[d] greater emphasis on stewardship of the rangeland resource." *Id.* The Supreme Court upheld the 1995 regulations over challenges by the livestock industry. *Kraayenbrink*, 632 F.3d at 478; *Babbitt*, 529 U.S. at 739.

The 1995 regulations adopted a new set of ecological mandates for grazing on the public lands, called the Fundamentals of Rangeland Health (FRH). 43 C.F.R. § 4180 *et seq.* (1995). These established nationwide "fundamentals" of rangeland health, comprising ecological criteria that all public lands must meet, 43 C.F.R. § 4180.1; and required BLM to adopt state-specific "standards and guidelines" of rangeland health as well. *Id.* § 4180.2.

The FRH regulations mandate BLM to promptly change grazing management—no later than the next grazing year—if any of the "fundamentals" or "standards and guidelines" of rangeland health are not met on an allotment, and include mandatory terms and conditions to ensure significant progress is made toward achieving the FRH requirements. 43 C.F.R. §§ 4180.1 & 4180.2(c). *See also Idaho Watersheds Project v. Hahn,* 187 F.2d 1035 (9th Cir. 1999) (upholding BLM duty to change management before next grazing year when rangeland health standards not met due to grazing); *W. Watersheds Project v. Salazar*, 843 F.Supp.2d 1105, 1128–

30 (D. Idaho 2012) (BLM has duty to adopt mandatory terms and conditions in grazing permits to ensure compliance with FRH requirements).

The 1995 BLM grazing regulations remain in place despite BLM efforts to weaken them in 2006 in ways sought by the livestock industry. *See Kraayenbrink, supra* (affirming district court order vacating and setting aside 2006 regulation changes); AR010537 n. 30 (IBLA Decision recognizing 1995 regulations remained in effect for Duck Creek decisions).

**Background on Duck Creek Allotment**

The Duck Creek allotment (DCA) encompasses 22,731 acres in Rich County, located southeast of Bear Lake near the Utah/Wyoming border. *See* AR020877 (map). It includes 13,090 acres of public lands, 8,585 acres of private lands, and 1,056 acres of state lands. AR010537.

In 1979, BLM issued a Final Randolph Grazing Management Environmental Statement (Randolph EIS), which assessed grazing management on 140,000 acres of public land in Rich County, including the DCA. AR021016–588 (EIS). The Randolph EIS noted that two active sage-grouse leks (mating areas) were located on the DCA. *See* AR021109.

Based on the Randolph EIS, BLM adopted the Randolph Management Framework Plan (MFP) in 1980. AR021589–747 (MFP). The 1980 MFP remains the applicable BLM land use plan for the DCA under FLPMA, but was amended by BLM in 2015 to adopt new sage-grouse habitat designations and protections.[1]

In August 2001, BLM issued an EA/FONSI and Final Decision amending grazing permits on five allotments in Rich County, including the DCA. AR021761–84 (EA/FONSI); AR021785–800 (Decision). WWP's then-Utah Director, Dr. John Carter, conducted monitoring

---

[1] The 2015 Sage-Grouse Plan Amendments and EISs, including for Utah, are available on BLM's E-planning website at: https://eplanning.blm.gov.

of livestock grazing impacts on the DCA and other Rich County allotments in 2001, and submitted a report to BLM identifying extensive overgrazing impacts. AR019803–57. But BLM refused to address those findings, asserting the report was provided too late. AR021794.

In litigation before this Court, WWP challenged the 2001 EA/Decision along with other northern Utah grazing permits approved by the BLM at the same time. *See* First Amended Complaint, *W. Watersheds Project v. Carpenter*, No. 2:02-cv-0352-PGC (D. Utah), ECF No. 75. In April 2005, the Court approved settlement of that case. *Id.*, ECF Nos. 98–99.

Under the *Carpenter* settlement, BLM agreed to revise the 1980 Randolph MFP and prepare an EIS "to undertake a comprehensive review of livestock grazing and all other multiple uses on the public lands managed" by BLM's Salt Lake Field Office, including the DCA. *See id.*, ECF No. 98 at 2. BLM promised to begin the EIS in 2005 and complete it by 2009. *Id.* at 2–3. BLM also committed to "employ open, public procedures to ensure that the public, including but not limited to Plaintiff and Intervenors, has full opportunity to provide BLM with perspectives, data, scientific literature and other input, so that BLM may consider and use such input" in its analysis and decision-making. *Id.* at 3.

But BLM failed to live up to its promises in the *Carpenter* settlement to revise the outdated Randolph MFP and prepare a comprehensive EIS for grazing in BLM's Salt Lake Field Office, and its commitment to give WWP "full opportunity" to provide data and other input. To this date, no such revised land use plan or EIS have been conducted by BLM, and BLM has

steadfastly refused to cooperate with WWP in its monitoring of the DCA and other northern

Utah allotments. *See* accompanying Declarations of Dr. John Carter and Jonathan Ratner.[2]

While the *Carpenter* litigation was pending, a group called "Rich County Coordinated

Resource Management" (CRM) was formed by local county officials, ranchers, and others "to

provide natural resource management recommendations." AR010539; AR027045–56. In

response to a "Duck Creek Grazing Plan" adopted by the CRM, BLM issued a 2004 EA and

Decision for the DCA, to institute a 6-pasture rotation grazing system and approve new fences

and water developments. AR010539; AR027037-38. WWP appealed the 2004 EA/Decision to

OHA, and after a hearing with "considerable testimony" before ALJ Heffernan identifying

defects in BLM's analysis, BLM moved to vacate and remand the 2004 Decision, which the ALJ

granted in May 2005. AR027038.

**DCA Monitoring**

BLM conducted monitoring of the DCA in 2005, and WWP sought to "supplement"

BLM's efforts by conducting additional monitoring of the DCA, led by Dr. John Carter, Dr.

James Catlin, and Robert Edwards. AR017784–831; AR027064; AR000445–46, 555–56.  Dr.

Carter—who earlier monitored the DCA and provided the 2001 report that BLM refused to

consider in its 2001 EA/Decision—is a Ph.D. ecologist, a professional consultant on western

public lands ecology, and has expertise in upland and riparian ecology, habitat monitoring, range

suitability and capability, data collection, and scientific validation of land management methods.

---

[2] Although WWP's Article III standing is abundantly documented in the record, the Carter and
Ratner declarations are submitted to further confirm WWP's standing, including by documenting
their continued monitoring of the DCA showing ongoing livestock degradation under the 2008
Decision and EA affirmed by the IBLA. *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 562–
65 (1992) (addressing plaintiff burden to demonstrate standing).

AR 009139–288; AR 019747–756; AR 027056. He has been an expert witness on range conditions and ecology in other federal court and OHA cases. *See, e.g., W. Watersheds Project v. Kraayenbrink*, 538 F.Supp.2d 1302, 1323 (D. Idaho 2008) (Dr. Carter a "recognized expert"); AR019750-52 (listing cases).

Dr. Catlin has expertise in ecosystem planning, habitat monitoring, data collection, and the scientific validation of land management methods. AR00238–256 & 281–82. Dr. Catlin has done considerable monitoring on many grazing allotments in Utah. AR000287–290. Mr. Edwards worked for BLM more than 30 years in range and resource management positions, including as Range Conservationist, District Program Lead for the Range and Wild Horse and Burro Program, Range Conservationist/Watershed Specialist, and Natural Resource Specialist. AR014489–99; AR020467–68; AR027057–58.

They collected data on the DCA in each of the years 2005-2008, including the amount of available forage ("production"), consumption of forage by livestock and wildlife ("utilization"), vegetation cover, and number of livestock. AR027067–85; AR027142. Their data reflected high livestock utilization on most grazed areas of the allotment, low forage production of native grasses, and significant bare ground. *See* AR018346-69; AR 017784-831. The results indicated that current levels of cattle grazing threatened to permanently impair the allotment. AR017787.

**NEPA Process for 2008 Decision**

On June 2, 2006, BLM participated in a CRM meeting to address the DCA—but WWP's representatives did not receive proper notice of the meeting and did not attend it. AR027045–55. As the ALJ found, "BLM improperly rel[ied]" on the June 2006 CRM meeting as the "exclusive scoping venue" for its DCA NEPA process, yet "BLM refused to open [it] for adequate public

comment" on WWP's data, AR027108, "and the input of the CRM was accepted virtually in-toto." AR027054. By the time BLM conducted another public meeting in October 2007, it already released a Draft EA that adopted the CRM's modified grazing scheme, and "there were no material substantive differences" between the Draft and Final EAs. AR027054. Thus, the "October 2007 meeting was too late to receive meaningful input" from WWP. *Id.*

Moreover, in September 2007, BLM asked the CRM to change the June 2006 meeting minutes to state that it was held as a "scoping" meeting for BLM under NEPA and the grazing regulations. AR027051–52; AR018101 (9/12/07 email). The ALJ found this was a "post-hoc effort . . . to suit [BLM's] litigation-related concerns," and "constituted an overt abuse of [] administrative discretion (i.e. tampering with records one year after-the-fact)," which violated public participation requirements of NEPA and BLM's duty to conduct "consultation, cooperation and coordination" (CCC) with WWP under its regulations, 43 C.F.R. §§ 4120.2(a) & 4130.2(b). AR027049–53.

In July 2007, BLM issued a Draft EA for new ten-year grazing permits on the DCA. AR020911–1015. The Draft EA noted that the CRM and Utah Division of Wildlife Resource (UDWR) released a "Rich County CRM Greater Sage-grouse Conservation Plan" (Rich County SG Plan) in October 2006. AR020919–20. The Draft EA stated that the DCA contains "important spring strutting and nesting" habitat for sage-grouse, AR020923, plus winter habitat and two sage-grouse leks—1 active and 1 inactive. AR020981–82. It asserted that "Rich County is considered to have healthy sage grouse populations," but did not identify sage-grouse populations, lek locations, or other habitat on the DCA. *Id.* The Draft EA did not acknowledge that the 1979 Randolph EIS found <u>two</u> active leks on the DCA, compared to the one active lek

and one inactive lek reported in 2008, nor evaluate the significance of losing 50% of the active leks there.

The July 2007 Draft EA disclosed that BLM's 2005 monitoring found that 6 out of 29 springs and 1 out 5 streams were not meeting Utah's FRH Standard 2 for Riparian and Wetland areas, and that others were "functioning at risk." AR020923. But disregarding the extensive data submitted by WWP demonstrating that current grazing levels were causing more extensive damage on the DCA, the Draft EA asserted that BLM's 2005 monitoring found "98 percent of the allotment having upward or upward to static trend," while the remaining 2% were primarily riparian areas over-utilized by livestock. AR020988–90. Because ranchers recently constructed fences on private lands, the Draft EA modified the CRM's proposed DCA grazing scheme to adopt a four-pasture rotation system, and install a new "water system" with 8.5 miles of pipeline and 6 watering troughs, plus 3.8 miles of new fences. AR020932–37.

WWP submitted comments on the Draft EA, raising concerns about the rejection of WWP's data and scientific literature and the lack of collaboration on the part of BLM and the CRM. AR 017331–46.

Again rejecting WWP's evidence and comments, on May 29, 2008, BLM issued a Notice of Proposed Decision and FONSI, along with a Final EA (the July 2007 EA). AR020893–1015. Denying WWP's administrative protest, AR020420–35, BLM issued the DCA Decision and FONSI on September 12, 2008, adopting the proposed action from the EA. AR020741–892. On October 28, 2008, WWP timely appealed to OHA. AR017282–325.

**Proceedings Before ALJ Heffernan**

ALJ Heffernan conducted an evidentiary hearing on WWP's appeal over the course of 55 non-consecutive days between June 8, 2009 and July 28, 2011. The hearing generated a 15,639-page transcript and 375 exhibits. AR027035–36.

During the hearing, Dr. Carter, Dr. Catlin, and Mr. Edwards testified in detail about their monitoring efforts, protocols, and results. Dr. Catlin was on the stand for 25 days and Dr. Carter for 11 days, giving Judge Heffernan extensive opportunity to evaluate their qualifications, knowledge, and credibility. AR 027988. BLM presented testimony from its assistant field manager and various range management staff, but did not present any wildlife biologist to address sage-grouse or wildlife issues. *See* AR010560; AR010623.

In May 2013, Judge Heffernan issued his 139-page ALJ Decision with extensive evidentiary and witness credibility determinations, findings of fact, and conclusions of law. AR027035–174 (Attachment B hereto). Judge Heffernan held that the testimony of Drs. Carter and Catlin was "credible" and entitled "to receive reasonable deference." AR027056. In contrast, Judge Heffernan found the testimony of BLM's staff at the hearing to be "at various times notably uninformed, inconsistent, and contradictory." *Id.*

Judge Heffernan discussed the "very heavy burden of proof" that WWP must meet in challenging BLM's Decision and EA under the IBLA's precedents. AR027042–45. He stated that reversal is appropriate only if BLM's decision "is not reasonable or is not in compliance with pertinent regulations," or "where the hearing shows that BLM made a clear error of law or fact; failed to consider important environmental aspects; or its decision is not grounded upon technical expertise of staff competent in their field." AR027043.

Judge Heffernan also noted that, "in the typical grazing appeal, the Appellants rarely have independent monitoring data . . . and they typically critique the purported accuracy of BLM's data and documents," which "fails to meet the high burden of proof" required by the IBLA. *Id.* Here, by contrast, WWP's scientists "were on the ground monitoring on the [DCA] for years," and "proffered their own, independently derived and detailed documentary monitoring data" along with "very extensive testimony and accompanying exhibits," "academic and scholarly supportive exhibits," and "first-hand, on-the-ground, knowledge" about the DCA. AR027043–44.

The ALJ thoroughly discussed the monitoring data presented by both WWP and BLM. AR027057–107. As he explained, the "main difference" between them was that "BLM primarily relied on visual, ocular estimates," while WWP's scientists "actually clipped and weighed at each and every one of their monitoring sites." AR027057.[3] In contrast to WWP's more extensive monitoring, BLM did not monitor intensively any year except 2005, and did not conduct riparian stubble height monitoring. AR027105–06. Yet BLM rejected all WWP's data, because it was supposedly "not in accord with BLM's Technical References," "inconsistent with BLM's [data]," and "biased." AR027105.

Judge Hefferenan made many findings rejecting these BLM criticisms. Citing a leading rangeland treatise (Holechek), he noted that "qualitative techniques" like BLM's "ocular" estimates "are subjective and their reliability cannot be readily quantified." AR027059. Moreover, both "BLM and [WWP] deviated to some extent from the precise methodologies set

---

[3] As the ALJ explained, BLM initially did a "calibration" in 2005 where it clipped and weighed plants at 4 sites, but "at the vast majority of their monitoring sites BLM eyeballed their key forage species and then noted their visual estimates on their field data sheets." *Id.*

out in the [BLM] Technical Reference," but that is "perfectly permissible" as it is just a guideline

and not mandatory. AR027057. BLM's criticism that WWP did not perform "proper functioning

condition" (PFC) analysis of riparian areas was unavailing, because WW performed riparian

stubble height measurements that BLM did not do, WWP used the stubble height monitoring

method in BLM's Technical Reference for utilization, and BLM's riparian Technical Reference

says that PFC "is the starting as the minimum level of assessment for riparian-wetland areas," so

BLM should have considered WWP's additional data. AR027074–76. He concluded:

> [WWPs] monitoring was more extensive over a period of several years than was that of
> the BLM. . . [and] conducted over a longer, more consistent period of time. . . . [WWP]
> followed the general dictates of pertinent IBLA precedent and spent significant time and
> resources to develop their own, independent evidence. . . [WWP] collected data on
> different, more diverse sites than did BLM. . . [and provided] quantitative data in
> comparison to BLM's qualitative estimates.

AR027105–06.

    After weighing the evidence, Judge Heffernan concluded that BLM committed

"reversible error" in numerous ways, violating NEPA and BLM's regulations. These included:

    (a) Environmental baseline: "The EA fails to provide adequate baseline information . . .

because BLM rejected totally [WWP's] very extensive and comprehensive data base . . . which

shows that the current level of grazing is having a significant impact on both upland and riparian

vegetation. . . . [and] would have facilitated BLM in taking a more informed 'hard look' at direct,

indirect and cumulative impacts." AR027108–09.

    (b) Greater sage-grouse: "BLM violated NEPA by failing to provide a full and fair

discussion of the potential environmental impacts of the proposed grazing system upon Sage

Grouse," AR027123–29.

(c) <u>Impacts of new troughs</u>: The EA "didn't adequately analyze the site-specific impacts of the higher concentrations of livestock around the new upland water troughs," and left "completely unassessed the important issue of radiating grazing impacts from the new troughs." AR027129–32.

(d) <u>Range of alternatives</u>: BLM violated NEPA by not considering a reasonable range of alternatives, such as reduced grazing, because the EA only considered two alternatives, both with the "same deferred rotation grazing system, the same terms and conditions, and the same management objectives." AR027133–36.

(e) <u>Cumulative impacts</u>: Citing the extensive private and state lands intermixed on the DCA, and the numerous projects including fencing, water developments, and vegetation treatments on those lands, the ALJ held that the EA violated NEPA "because a much more detailed cumulative impacts analysis was required." AR027136–39.

(f) <u>FRH Standard 3, wildlife habitats</u>: The ALJ found that BLM did not adequately evaluate upland conditions and habitats for sage-grouse under Utah FRH Standard 3 and NEPA, because BLM's "allotment-wide 'assumption' that wildlife habitat conditions" complied with Standard 3 was "completely without site-specific factual basis." AR027147–54.

Based on these and other findings, the ALJ Decision reversed and remanded the 2008 Decision, FONSI, and EA to BLM for further analysis and decision. AR027171–73. However, saying he lacked authority to do anything more, Judge Heffernan denied WWP's request to adopt particular remedies on remand. *Id.*

**Proceedings Before the IBLA**

BLM appealed ALJ Heffernan's rulings to the IBLA, AR010830-84, while WWP appealed his decision not to grant remedies WWP requested. AR010826-29. On August 15, 2013, the IBLA granted BLM's petition to stay the ALJ Decision pending appeal, allowing grazing to continue under the BLM's 2008 Decision. AR010780-82.

Four years later, the IBLA issued its Duck Creek Decision on September 22, 2017, reversing the ALJ and upholding BLM's 2008 Decision, FONSI and EA. AR010527–659 (Attachment A). This litigation followed.

## SUMMARY OF THE ARGUMENT

The IBLA applied the wrong legal standards, relying on the Taylor Grazing Act and its regulation for "adjudicating grazing preferences" to hold that BLM is entitled to extreme deference. In so doing, the IBLA wrongly disregarded NEPA's legal standards for challenging the adequacy of an agency's analysis. These errors of law alone require reversal.

Moreover, in reversing the ALJ's factual findings and witness credibility determinations, the IBLA ignored its own precedents that ALJ findings will not be overruled when supported by substantial evidence, and did not even attempt to explain its deviation from its own rule.

By mischaracterizing the nature of WWP's claims and evidence at hearing, and relying on presumptions not in the record, the IBLA's reversal of the ALJ's many factual findings and legal conclusions was also arbitrary and capricious, and not supported by substantial evidence.

The IBLA also violated NEPA in upholding BLM's EA, which the ALJ correctly found was inadequate in many ways, including its failure to take a "hard look" at baseline conditions, direct and cumulative adverse impacts upon sage-grouse and other habitats, or any reduced

grazing alternative. WWP is severely prejudiced by these errors, because the IBLA Decision authorizes continued ecologicl degradation of the DCA, and sets an impossible bar and unlawful precedent for WWP in challenging BLM grazing decisions. Thus, this Court must reverse.

## ARGUMENT

### I.       STANDARDS OF REVIEW

As the District of Idaho observed in another WWP case challenging the IBLA's reversal of an ALJ decision, "[t]he standard of review in this case is complex, raising two somewhat overlapping, but independent, layers of review. The first concerns the IBLA's review of the ALJ's decision. The second concerns this Court's review of the IBLA's decision." *W. Watersheds Project v. U.S. Dept. of Interior*, No. 08-0506-E-BLW, 2009 WL 5218020 at *6 (D. Idaho 2009) (*WWP v. DOI*). Both are discussed below.

### A.       IBLA Standards of Review

At the first level, the DOI appeal regulations authorize ALJs, such as Judge Heffernan, to conduct an administrative hearing for purposes of developing a record *de novo* in reviewing BLM decisions. *See* 43 C.F.R. §§ 4.1(a) & 4.474–.478; *Nat'l Wildlife Fed'n v. Bureau of Land Mgmt.*, 140 IBLA 85 (1997) (explaining ALJ authority).

For its part, the IBLA "has the authority to make decisions concerning the public lands as fully and finally as might the Secretary himself," *U.S. v. Dunbar Stone Co.*, 56 IBLA 61, 67 (1981), and thus the IBLA has *de novo* review authority over BLM and ALJ decisions. 43 C.F.R. § 4.1; *IMC Kalium Carlsbad, Inc. v. Interior Bd. of Land Appeals*, 206 F.3d 1003, 1009 (10th Cir. 2000). In conducting *de novo* review of an ALJ decision, the IBLA must consider the

"whole record," including all hearing evidence. 43 C.F.R. § 4.480; *WWP v. DOI,* 2009 WL 5218020 at *6.

The IBLA has long followed the rule that it should accord substantial deference to ALJ findings when they are supported by substantial evidence. *See U.S. v. Rannells*, 175 IBLA 363, 383 (2008); *U.S. v. Miller*, 165 IBLA 342, 377 (2005); *Wilcox v. Bureau of Land Mgmt*., 134 IBLA 57, 71–72 (1996); *Bureau of Land Mgmt. v. Carlo*, 133 IBLA 206, 211 (1995); *Yankee Gulch Joint Venture v. Bureau of Land Mgmt.*, 113 IBLA 106, 136 (1990); *U.S. v. Whittaker*, 95 IBLA 271, 286 (1987); *U.S. v. Ramsey*, 84 IBLA 66, 68 (1984). The IBLA also has "repeatedly expressed reluctance to disturb an administrative law judge's findings of fact based on credibility determinations where they are supported by substantial evidence." *Rannells*, 175 IBLA at 383 (citing cases). "The basis for this deference is the fact that the Judge who presides over a hearing has the opportunity to observe the demeanor of the witnesses and is in the best position to judge the weight to be given to conflicting testimony." *Id.*

### B.    Judicial Standards of Review

At the second level, federal courts review an IBLA decision under the APA, to determine whether it was arbitrary, capricious, an abuse of discretion, not supported by substantial evidence, or not in accordance with law. *See* 5 U.S.C. § 706(2)(A) & (D); *Pennaco Energy, Inc. v. U.S. Dep't of Interior*, 377 F.3d 1147, 1157 (10th Cir. 2004); *IMC Kalium*, 206 F.3d at 1009. Under the APA standards, courts must consider the "entire record" in conducting judicial review of IBLA decisions. *Pennaco Energy*, 377 F.3d at 1157.

An agency decision is arbitrary and capricious under the APA if it "(1) entirely failed to consider an important aspect of the problem, (2) offered an explanation for its decision that runs

counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise, (3) failed to base its decision on consideration of the relevant factors, or (4) made a clear error of judgment." *N.M. ex rel. Richardson v. Bureau of Land Mgmt.*, 565 F.3d 683, 704 (10th Cir. 2009) (internal quotations omitted). "The duty of a court reviewing agency action under the 'arbitrary or capricious' standard is to ascertain whether the agency examined the relevant data and articulated a rational connection between the facts found and the decision made." *Olenhouse v. Commodity Credit Corp.,* 42 F.3d 1560, 1576 (10th Cir. 1994) (citations omitted).

Evidence in the record is "substantial" if it is "enough to justify, if the trial were to a jury, a refusal to direct a verdict when the conclusion to be drawn is one of fact." *Ill. Cent. R.R. Co. v. Norfolk & W. Ry.,* 385 U.S. 57, 66 (1966); *Olenhouse*, 42 F.3d at 1575-76 (discussing substantial evidence standard). "This is something more than a mere scintilla but something less than the weight of the evidence." *Foust v. Lujan,* 942 F.2d 712, 714 (10th Cir. 1991) (reversing IBLA for lack of substantial evidence).

Moreover, an agency decision "must be upheld, if at all, on the basis articulated by the agency itself." *Olenhouse*, 42 F.3d at 1575. "Thus, the grounds upon which the agency acted must be clearly disclosed in, and sustained by, the record." *Colo. Wild v. U.S. Forest Serv.*, 435 F.3d 1204, 1213 (10th Cir.2006). "After-the-fact rationalization by counsel in briefs or argument will not cure noncompliance by the agency with these principles." *Id*.

An agency also acts "arbitrarily and capriciously when its actions depart from well-established agency precedent without a reasoned explanation." *Hoyl v. Babbitt*, 129 F.3d 1377, 1384 (10th Cir. 1997). Agencies "are under an obligation to follow their own regulations,

procedures, and precedents, or provide a rational explanation for their departure." *Big Horn Coal Co. v. Temple*, 793 F.2d 1165, 1169 (10th Cir. 1986). "[T]he court must require the agency to adhere to its own pronouncements or explain its departure from them; an agency must apply criteria it has announced as controlling or otherwise satisfactorily explain the basis for its departure therefrom." *Midwestern Transp., Inc. v. Interstate Commerce Comm'n,* 635 F.2d 771, 777 (10th Cir.1980). Thus, an agency "may not depart, sub silento, from its usual rules of decision to reach a different, unexplained result in a single case." *Idaho Power Co. v. Fed. Energy Reg. Comm.*, 801 F.3d 1055, 1058 (9th Cir. 2015) (quotation omitted).

## II.     THE IBLA APPLIED INCORRECT LEGAL STANDARDS.

The IBLA Decision must be reversed, first, because it applied incorrect legal standards to WWP's challenges to BLM's 2008 EA and Decision, which the IBLA derived from the Taylor Grazing Act (TGA) and used to erect an insurmountable burden of proof on parties—like WWP here—seeking to challenge the adequacy of BLM's NEPA analysis of grazing decisions.

### A.     The IBLA Wrongly Applied the TGA.

The IBLA held that BLM "grazing decisions" receive "added deference" compared with other BLM land management decisions. However, IBLA erred as a matter of law in applying this standard because the statute IBLA relied on—the TGA—was not at issue in this case, and does not reflect the requirements of NEPA and FLPMA, applicable here.

The IBLA began by stating: "[Judge Heffernan] does not give proper weight to the fact that WWP's appeal is from a Final Decision issued pursuant to the TGA." AR010534 (emphasis added). IBLA supported this statement by quoting 43 C.F.R § 4.480(b), regarding adjudication of "grazing preferences." *Id.* n. 16. The IBLA continued:

> ALJ Heffernan should have addressed whether WWP met its burden under NEPA <u>in light of the fact that BLM's experts and their conclusions are entitled to added deference when they address grazing issues affecting grazing preferences under the TGA</u>. . . .

AR010535 (emphasis added; internal citations omitted).

The IBLA reiterated this analysis in its discussion of the "Burden of Proof in TGA Cases." *See* AR010562–64. It stated that in "challenging a decision <u>adjudicating grazing privileges under the TGA</u>, the burden is on the appellant before an ALJ to show BLM's grazing decision is not 'reasonable' or does not represent 'substantial compliance' with the TGA and its implementing rules." AR010562 (emphasis added). The IBLA again supported this assertion by citing and quoting 43 C.F.R § 4.480(b), which states: "No <u>adjudication of grazing preference</u> will be set aside on appeal, if it appears that it is reasonable and that it represents a substantial compliance with the provisions of part 4100." *Id.* n. 174 (emphasis added).

The IBLA wholly failed to explain why it relied on the TGA and 43 C.F.R § 4.480(b) regarding adjudication of grazing preferences here. The TGA provides that "[p]reference shall be given in the issuance of grazing permits to those within or near a district who are landowners engaged in the livestock business, bona fide occupants or settlers, or owners of water or water rights, as may be necessary to permit the proper use of lands, water or water rights owned, occupied, or leased by them." 43 U.S.C. § 315b. The term "grazing preference" is defined under the BLM regulations as a "superior or priority position against others for the purpose of receiving a grazing permit or lease," and this "priority is attached to base property owned or controlled by a permittee or lessee." *See* 43 C.F.R. § 4100.0-5.

But this case has nothing to do with adjudicating grazing preferences or TGA violations. WWP did not assert any grazing preference on the DCA, nor did it dispute grazing preferences

held by DCA permittees. WWP raised no challenge under the TGA at all. The IBLA never acknowledged that WWP raised no TGA challenge, and it utterly failed to explain why it relied on 43 C.F.R § 4.480(b) regarding adjudication of grazing preferences in holding that the ALJ Decision did not properly give the "added deference" to BLM in considering WWP's NEPA challenges. The IBLA's unexplained reliance on a statute and regulations not at issue in this case constitutes clear error, requiring reversal. 5 U.S.C. § 706(2)(A); *Richardson*, 565 F.3d at 704.

**B.    The IBLA Improperly Overrode NEPA's Standards.**

Moreover, by invoking its stringent burdens of proof for adjudicating grazing preferences under the TGA, the IBLA wrongly elevated the TGA over the federal statutes that are actually at issue in this case, particularly NEPA, thus again committing reversible error of law.

As quoted above, the IBLA asserted that WWP had to meet a heavier burden of proof for its NEPA claims because "BLM's experts and their conclusions are entitled to added deference when they address grazing issues affecting grazing preferences under the TGA." AR010535. The IBLA did not even acknowledge that NEPA, FLPMA, and PRIA were enacted after the TGA, much less recognize that those statutes substantially broadened BLM's duties in managing the public lands to meet ecological and other mandates. *See, e.g.,* G. Coggins, "The Law of Public Rangelands Management IV: FLPMA, PRIA, and the Multiple Use Mandate," 14 *Envtl. L.* 1, 2-40 (1983); G. Coggins & M. Lindeberg-Johnson, "The Law of Public Rangeland Management II: The Commons and the Taylor Grazing Act," 13 *Envtl. L.* 1, 27-32 (1982) (discussing TGA and impacts of NEPA, FLPMA and PRIA on BLM duties in managing grazing on public lands). This omission is particularly significant because the IBLA applied more onerous burdens on WWP to challenge the BLM's EA and Decision than is required under NEPA and the APA.

NEPA obligates federal agencies "to consider every significant aspect of the environmental impact of a proposed action. It also ensures that an agency will inform the public that it has considered environmental concerns in its decision-making process." *Utah Shared Access Alliance v. U.S. Forest Service*, 288 F.3d 1205, 1207 (10th Cir. 2002), *quoting Balt. Gas & Elec. Co. v. Natural Res. Defense Council*, 462 U.S. 87, 97 (1983). The NEPA regulations further direct that federal agencies must utilize high-quality information, including accurate scientific analyses, in their NEPA analyses, 40 C.F.R. § 1500.1(b), and ensure their NEPA documents are based on professional and scientific integrity. 40 C.F.R. § 1502.24.

NEPA thus places the duty on the <u>federal agency</u>—BLM here—to consider all potential impacts in a rigorous and scientific fashion, even though the NEPA process is intended to allow the public adequate opportunity to provide input showing potential impacts that the agency should consider. *See Vermont Yankee Nuclear Power Corp. v. Natural Res. Def. Council*, 435 U.S. 519, 553 (1978) ("NEPA places upon an agency the obligation to consider every significant aspect of the environmental impact of a proposed action," but "it is still incumbent upon intervenors who wish to participate to structure their participation so that it is meaningful").

Moreover, a party challenging an agency's NEPA analysis does not have to prove that adverse environmental impacts will occur beyond any shadow of a doubt, as the IBLA imposed here. Instead, the challenger bears the burden of showing that the agency did not take a "hard look" at information relevant to the decision, including a "reasonably thorough discussion of the significant aspects of the probable environmental consequences" of the proposed action. *See Richardson,* 565 F.3d at 704; *State of Cal. v. Block*, 690 F.2d 753, 761 (9th Cir. 1982). While the courts conducting NEPA review will defer to agency expertise, the agency's exercise of that

expertise must have a rational basis and take "into consideration the relevant factors." *Utah Shared Access*, 288 F.3d at 1213; *Comm. to Preserve Boomer Lake Park v. Dept. of Transp.*, 4 F.3d 1543, 1553 (10th Cir. 1993).

The IBLA thus imposed a much higher and erroneous burden of proof than applies to WWP's NEPA challenges—and made it virtually impossible to challenge any BLM grazing decision, defeating the purposes of NEPA, as the record here demonstrates. Because the IBLA erred as a matter of law, reversal is required.

### III.   THE IBLA ARBITRARILY FAILED TO FOLLOW ITS OWN RULE REQUIRING SUBSTANTIAL DEFERENCE TO AN ALJ'S FACTUAL FINDINGS.

As explained above, the IBLA has long held that it should normally accord deference to ALJ findings when they are supported by substantial evidence. *See Rannells*, 175 IBLA at 383; *Miller*, 165 IBLA at 377; *Dunbar Stone*, 56 IBLA at 68. Moreover, the IBLA has "repeatedly expressed reluctance to disturb an administrative law judge's findings of fact based on credibility determinations where they are supported by substantial evidence." *Rannells*, 175 IBLA at 383

As discussed in detail in Argument Sections III and IV below, the IBLA reversed nearly all of the ALJ's factual findings and credibility determinations—including regarding the expertise of WWP's scientists, bias shown by BLM against WWP during the DCA decision process, and the multiple defects found by the ALJ in BLM's assessment of habitat conditions and potential adverse impacts.

Yet in so doing, the IBLA completely ignored its rule and precedents giving substantial deference to ALJ findings of fact and witness credibility determinations. Not once did the IBLA

Decision acknowledge its rule or cite these precedents—much less attempt to explain why the IBLA was deviating from them here.

Again, it is arbitrary and capricious for an agency to disregard its own prior precedents and rules of decision in a specific case, without providing any reasoned basis for doing so. *See Hoyl*, 129 F.3d at 1384 (agency acts "arbitrarily and capriciously when its actions depart from well-established agency precedent without a reasoned explanation"); *Big Horn Coal*, 793 F.2d at 1169 (agencies "are under an obligation to follow their own regulations, procedures, and precedents, or provide a rational explanation for their departure"); *Olenhouse*, 42 F.3d at 1575 n. 25 ("arbitrary and unexplained departure from agency precedent" is grounds for reversal).

By abandoning its own precedents regarding the substantial deference which the IBLA normally affords an ALJ's findings and credibility determinations—without ever acknowledging it was doing so, much less attempting to explain why—the IBLA Decision was thus arbitrary and capricious, requiring reversal.

## IV.    THE IBLA DECISION WAS ARBITRARY AND CAPRICIOUS, AND NOT SUPPORTED BY SUBSTANTIAL EVIDENCE, IN REVERSING KEY FINDINGS AND CONCLUSIONS OF THE ALJ.

Further, substantial evidence did support the ALJ's findings of fact and conclusions of law. The ALJ recited the "very heavy burden of proof" that WWP had to meet in challenging BLM's EA and Decision, AR027042–45, and made detailed findings and conclusions in favor of WWP under that standard of proof, holding that BLM did not comply with NEPA and the grazing regulations in numerous respects, as summarized above.

In reversing, the IBLA Decision mischaracterized the nature of WWP's claims, disregarded the hearing evidence cited by the ALJ, and relied on non-record presumptions to

wrongly overturn ALJ Heffernan's findings in favor of WWP. Accordingly, the IBLA Decision
again must be reversed as being arbitrary and capricious, and not supported by substantial
evidence, as discussed below.

### A.      The IBLA Mischaracterized WWP's Evidence and the ALJ's Findings.

The IBLA noted that "the burden was on WWP to make an affirmative showing that
BLM failed to consider a substantial environmental question of material significance," and then
faulted WWP for not even trying to meet that standard, asserting: "Instead WWP simply
'pick[ed] apart a record with alleged errors and disagreements.'"AR010535. Citing BLM's post-
hearing briefing, the IBLA continued: "BLM correctly states that, 'with little explanation, the
ALJ simply chose to accept Appellants' data over BLM's data, and to believe Appellants'
witnesses over BLM's witnesses.'" AR010536 (emphasis added). Reversing, the IBLA held:
"The ALJ was required to heed the Board's longstanding principle that an appellant's burden to
demonstrate error in a BLM grazing decision, founded on the professional opinion of BLM's
experts, will "not [be] carried by mere expressions of disagreement with BLM's analysis and
conclusions." *Id.* (emphasis added).

These IBLA mischaracterizations—that WWP "simply picked apart a record with alleged
errors and disagreements," "merely disagreed" with BLM, and the ALJ provided "little
explanation" for his findings—are belied by virtually every page of the ALJ's 139-page
Decision. As the ALJ detailed, WWP did not just criticize BLM's data or findings; it conducted
intensive monitoring over several years to provide its own data and analysis, and supported its
results and conclusions with extensive science. The ALJ—unlike the IBLA—heard the evidence
and testimony at hearing, and rendered detailed findings of fact, including on WWP's data and

WWP'S OPENING BRIEF --                       25

results compared to BLM's. AR027043–45; AR027056–132. The ALJ's findings and

conclusions, and all the extensive testimony and hearing exhibits they cite, show that the ALJ

Decision was supported by substantial evidence.

By contrast, in mischaracterizing WWP's case and the ALJ Decision, the IBLA Decision

is not supported by substantial evidence, requiring reversal. *See Foust,* 942 F.2d at 715–17

(reversing under substantial evidence standard where IBLA "ignored overwhelming evidence"

from hearing); *WWP v. DOI,* 2009 WL 5218020, at *8 (reversing where IBLA "re-drafted [the

ALJ's] decision to turn it into a weak strawman, and then proceeded to knock it down").

Here, the IBLA again erected a "weak strawman" by mischaracterizing WWP's case as

simply picking errors and the ALJ as providing no reasons in agreeing with WWP, when the

exact opposite is true. Reversal is thus required.

### B.    BLM's Biased Decision-Making.

The IBLA further lacked substantial evidence for reversing the ALJ's findings that

BLM's NEPA review and decision-making were biased in favor of the permittees, constituting

reversible error. *See* AR027045–55 (ALJ Decision). The IBLA first stated:

> ALJ Heffernan intimates that in identifying appropriate matters for NEPA review, BLM
> simply acceded to whatever was proposed by the permittees and CRM. <u>We find no
> evidence to substantiate that assertion and see no reason to doubt</u> that the EA reflects
> BLM's independent determination of appropriate matters for NEPA review. And in a
> related vein and for similar reasons, we reject any notion that BLM's NEPA review and
> decisionmaking were biased in favor of the permittees or CRM.

AR010600 (emphasis added).

Next, the IBLA rejected the ALJ's findings that BLM's "overall [CCC] process

[concerning grazing administration in the Allotment] was . . . skewed procedurally in favor of the

CRM and the permittees," again stating it could "see no evidence" of any bias:

> The ALJ's observation is speculative and without a basis in fact. . . . <u>We see no evidence</u> that BLM was biased toward CRM and the permittees or that WWP was prevented from being able to present its views to BLM during the NEPA review and decisionmaking process.

AR010606 (emphasis added). *See also* AR010607 ("We fail to discern any reversible error in BLM's pre-decisional NEPA review process").

These assertions that the IBLA could "see no evidence" of bias in BLM's decision-making are clearly erroneous. The evidence is replete in the record, and cited in the ALJ Decision. *See* AR027045–55. Among these, the ALJ documented that BLM improperly sought to alter the June 2006 CRM meeting minutes to say it was a "scoping" meeting under NEPA and the BLM regulations, and the subsequent October 2007 meeting "was too late to receive meaningful input" from WWP because BLM's Draft EA already decided to follow the CRM's proposed grazing scheme. AR027051–54.

Further, despite the *Carpenter* settlement—under which BLM promised to fully cooperate with WWP in conducting monitoring—BLM refused even to go onto the allotment with WWP to select monitoring sites, or incorporate WWP's data  in evaluating allotment conditions. *See* AR027149 (WWP was "prepared to help" BLM with data on uplands and riparian habitats, but "BLM rejected all their scientific and analytical efforts").

Again, the IBLA cannot simply disregard evidence in the record, as it did here in saying it could "see no evidence" of BLM bias, and the ALJ Decision "lacked a basis in fact." *See Foust,* 942 F.2d at 714–15 ("The substantiality of evidence must take into account whatever in the record fairly detracts from its weight") (quoting *Bowman Transp. v. Arkansas–Best Freight Sys.*, 419 U.S. 281, 284 n. 2 (1974)); *Olenhouse*, 42 F.3d at 1575-76.

C.      **Expertise and Credibility of WWP and BLM Witnesses.**

The sheer amount of time Judge Heffernan spent becoming familiar with the witnesses

and the facts in this case was extraordinary. The hearing lasted 55 days—the longest grazing

appeal hearing in OHA history. AR027035–36. The focus of the hearing was on the adequacy

and accuracy of BLM's monitoring and assessment of grazing impacts, including on sage-grouse

and upland and riparian habitats; and Judge Heffernan detailed the evidence presented by both

parties in arriving at his findings of fact and conclusions of law in favor of WWP. *See*

AR027057–146.

Having reviewed their education, training, and experience, Judge Heffernan found that

both Drs. Carter and Catlin had "several years of on-the-job, on-the-ground, training conducting

their extensive monitoring on the allotment, and, in my opinion, their testimony is credible with

respect to the conditions on the allotment, particularly in the time frame post-2005, the year in

which BLM conducted most of its monitoring." AR027056. He further held that the testimony of

Drs. Carter and Catlin was entitled "to receive reasonable deference." *Id*. *See also* AR027043–

44; AR027141–46; AR027154–66 (additional ALJ findings).

In contrast, Judge Heffernan found that BLM's lead witnesses—Michael Gates, the

acting field area manager, and Tyler Staggs, a range management specialist, who were

substantially involved in preparing the EA/Decision and leading BLM's team—had not spent as

much on the DCA as Drs. Carter and Caitlin, and their testimony was "at various times notably

uninformed, inconsistent, and contradictory." AR027056.

Yet the IBLA Decision in a single paragraph reversed the ALJ's findings and dismissed

the testimony of Drs. Catlin and Carter as merely "personal observations" by non-experts.

AR010574. It stated:

> [W]e find no basis for concluding that either Carter or Catlin possessed the credentials
> that would qualify them as experts in the fields of rangeland management and wildlife
> biology, subjects of particular relevance to evaluating conditions on the Allotment. . . . At
> best and for the most part, the testimony of Carter and Catlin represents nothing more
> than their personal observations of rangeland conditions at the various times they visited
> the Allotment.  They could not properly be considered experts in rangeland management.

*Id.* Based on this holding that the WWP witnesses did not qualify as experts, the IBLA then

proceeded to reject the ALJ's findings and conclusions that WWP presented persuasive evidence

proving that BLM's analysis of habitat conditions on the DCA was inaccurate and inadequate

under NEPA and the BLM regulations. *See* AR010575–92.

Again, the IBLA's assertion that it could "find no basis" that WWP's scientists qualified

as experts in rangeland management or wildlife biology must be reversed, as clear error and

unsupported by substantial evidence. Despite the voluminous record, the IBLA gave no

deference to Judge Heffernan's findings of fact or credibility determinations, and never

evaluated whether they were supported by substantial evidence, as required by the IBLA's

precedents. *See Big Horn Coal*, 793 F.2d at 1169 (reversing where agency did not follow its

prior case decision rule). The IBLA's Decision is particularly troubling because it did not respect

the unique position of Judge Heffernan as the trier of fact. As the District of Idaho explained in

reversing the IBLA in a similar recent grazing case:

> Once again, the Court is bound by the standard of review that requires deference, but this
> time the deference is due to the trial judge, who had the opportunity to view demeanor
> and weigh credibility. *See United Steel Workers of America v. Nat'l Labor Relations Bd.*,
> 482 F.3d 1112, 1117 (9th Cir.2007) (holding that administrative law judge can see and

hear witnesses and is in the best position to make credibility findings). These factors are especially important in determining bias or prejudice.

*WWP v. DOI,* 2009 WL 5218020, at *14. Reversal is required here for similar reasons.

### D.  Rangeland Conditions and Monitoring.

Closely related is the IBLA's rejection of the ALJs' findings concerning the monitoring conducted by WWP and BLM and their evaluation of "rangeland conditions" on the DCA. *See* AR01566–72, AR01575–87.

Throughout this discussion, the IBLA Decision cited BLM's briefing and exhibits and testimony at hearing as "persuasive," and faulted the ALJ for not doing so himself. *Id.* Again mischaracterizing the ALJ Decision, the IBLA asserted the "ALJ accords little to no value to the work of BLM rangeland specialists and other BLM experts in monitoring and evaluating conditions" on the DCA, while he "accords high probative value to WWP monitoring data when the record shows that data to be incorrect or, at best, suspect and unreliable." AR010567–68. Again, this mischaracterization is refuted by the ALJ's extensive discussion of BLM's monitoring and finding, compared to WWP's. AR027057–107. The IBLA simply substituted its judgment for the ALJs, again without heeding its rule of deferring to ALJ findings supported by substantial evidence, as Judge Heffernan's findings were supported here by the record.

### V.  THE IBLA VIOLATED NEPA AND THE APA IN REVERSING ALJ HEFFERNAN AND UPHOLDING BLM'S 2008 EA.

As discussed above, NEPA imposes the duty on federal agencies to rigorously consider all potential impacts in a scientific fashion, and consider a reasonable range of alternatives. *Vermont Yankee*, 435 U.S. at 553; *Balt. Gas & Elec.*, 462 U.S. at 97. To show an agency's analysis is inadequate under NEPA, a challenger must show that the agency did not take a "hard

look" at information relevant to the decision. *Richardson,* 565 F.3d at 704. While courts defer to agency expertise, the agency's exercise of that expertise must have a rational basis and take "into consideration the relevant factors." *Utah Shared Access*, 288 F.3d at 1213; *Comm. to Preserve Boomer Lake Park,* 4 F.3d at 1553.

Judge Heffernan recited these standards in evaluating WWP's NEPA challenges in light of the hearing record. AR027042–45. The ALJ found multiple NEPA violations in BLM's 2008 EA, all of which the IBLA Decision rejected. In so doing, as explained below, the IBLA was again arbitrary and capricious, not supported by substantial evidence in the record, and contrary to law under NEPA and the APA, requiring reversal by this Court.

### A.    Baseline Conditions.

Based on his detailed discussion of the hearing evidence on the respective WWP and BLM monitoring efforts and findings regarding habitat conditions on the DCA, AR027043–146, Judge Heffernan concluded that BLM's EA violated NEPA, first, because it failed "to provide adequate baseline information." AR027108–09. He explained:

> The EA fails to provide adequate baseline information, in large part because BLM rejected totally [WWP's] very extensive and comprehensive data base.  BLM ignored a significant data base developed by [WWP] over several years of on-the-ground monitoring which would have facilitated BLM in taking a more informed "hard look" at direct, indirect and cumulative impacts. . . [WWP's] data challenges the BLM conclusion that the overall allotment is in good condition. . . . In refusing to consider [WWP's] extensive data, which shows that the current level of grazing is having a significant impact on both upland and riparian vegetation, BLM failed to adequately assess the Duck Creek Allotment's existing baseline conditions.

*Id.*  The ALJ here cited numerous federal court cases on NEPA's "hard look" requirement to accurately establish baseline conditions for comparison to impacts of the proposed action. *Id.*

In reversing the ALJ, the IBLA applied its improper "burden of proof in TGA cases," and—after overruling the ALJ's findings about the credibility and expertise of WWP's witnesses and his findings about WWP's monitoring—the IBLA upheld BLM's EA as being properly based on the exercise of BLM's technical expertise, and assumed it adequately presented baseline conditions on the allotment. AR01568–88; AR01598–99; AR010607–20. The IBLA repeatedly accepted BLM's assertions of the validity of its data, and the supposed invalidity of WWP's, despite the ALJ's findings. *Id.*

Again, this misapplies the requirements of NEPA, by holding WWP to burdens of proof in TGA cases that is effectively impossible to meet. WWP accumulated and presented detailed data and findings that contested BLM's more limited data, and the ALJ found that BLM should have incorporated WWP's findings into its evaluation of baseline conditions—or at least expose that data to public comment through the NEPA process, which BLM refused to do. By jumping to the ultimate conclusion that BLM was right, the IBLA disregarded the importance of the NEPA process in allowing public input, and wrongly overrode the ALJ's correct conclusion that BLM's EA violated NEPA for failing to take a hard look at baseline conditions.

**B.     Sage-Grouse.**

Judge Heffernan found that the "issue of the Decision's impacts upon sage grouse habitat is, in my opinion, the most important impacts issue in this case," AR027103, and yet "the EA's discussion of the protection of sage grouse habitat is probably the weakest and most inadequate portion of the entire EA." AR027090. He supported these conclusions through detailed factual findings, with citations to the evidence and testimony at hearing. *See* AR027036; AR027103–04; AR027125–28.

Specifically, as he explained, the EA asserted that "most of the BLM lands within the (DCA) . . . meet all seasonal habitat requirements for sage grouse," AR027123 (citing EA pp. 71-72, 84), yet "BLM did not even know where the sage grouse leks were located, and, consequently, had inadequate knowledge of what the habitat conditions were in the areas surrounding sage grouse leks on the allotment." *Id.* He cited the "testimony of Mr. Staggs himself, who admitted on the record that he had no idea where the sage-grouse were located on the allotment." AR027090; *see also* AR027127 (further discussion).

Moreover, sage-grouse is a BLM sensitive species and BLM "acknowledges that protection of sage grouse is an important issue; however, BLM did not consider sage grouse nesting grounds when locating their monitoring sites, which is recommended by their own Utilization Technical Reference," AR027126–27, and "there is no evidence in the EA, Exhibit B-2, that BLM assessed in any context the height of perennial grasses and forbs as cover for sage grouse nest sites." AR027125 (citing Tr., 10304-305; Ex. W-213, p. 971).

He further agreed with WWP that the EA "failed to consider the sequential, periodic concentration of cattle in any one of the four pastures" under the new DCA grazing rotation scheme, as well as "impacts of affording cattle access to previously less-used areas of the allotment" due to construction of new water troughs and fences. AR027104. Specifically, he explained, "three of the four pastures would be grazed twice each year" under the new rotation grazing system, which "periodically concentrates four times more cattle in each smaller pasture area than under the prior system, which allowed cattle to graze the entire allotment." AR027128. Thus, "sage grouse nesting or brood rearing habitats will, from time-to-time, be confronted with the entire pasture-concentrated herd of cattle." *Id.*

Yet because BLM "did not know and did not determine the locations of sage grouse nesting and brood rearing areas on the allotment, BLM had no way of knowing, or even estimating, the impacts which the four pasture rotation system will have on sage grouse," including "whether this rotation system, with its increased concentration of livestock in one of the four pastures on a periodic basis, would have a catastrophic impact, or no impact at all, upon sage grouse nesting and brood rearing areas." *Id.*

ALJ Heffernan also noted evidence from the hearing indicating a decline in sage-grouse habitats and populations on the DCA, which the EA failed to address. *Se*e AR027123–24. He cited Appendix A to BLM's 2004 EA, which reported three leks (two active, one inactive) on the DCA, whereas the 2008 reported only two—and one of those was inactive. *Id.* (citing Ex. W-6, Appendix A; Tr., 9335-37). Further, "[WWP's] extensive monitoring proved that conditions did not improve between 2005 and 2008 on the allotment, and, consequently, it is not credible that conditions . . . could have improved so dramatically" as BLM claimed in the 2008 EA. AR027124. Moreover, WWP's "cover data demonstrates that the allotment does not meet the seven inch grass requirement" under the "Connelly Guidelines" for sage-grouse habitat requirements, yet the EA "contains no information on the location of nest sites and no information on whether the grasses and forbs at those locations are adequate to protect those nest sites." AR027125. Based on these and other findings, the ALJ concluded that BLM violated NEPA, stating:

> [I]t is my determination, based upon my review of the entire administrative record, that the quoted conclusion of the EA is factually unproven and materially incorrect, because BLM did not know where the sage-grouse leks or nesting areas were located on the allotment, and BLM, therefore, could not know, and did not know, what the impacts of their deferred rotation grazing system would be upon sage-grouse. (AR027104)

BLM did not know the location of or discuss existing sage grouse nesting or brood rearing areas so that it could make an informed management decision, including collateral issues, such as, the placement of fences, the placement of water troughs, and the proper sequencing of the rotation system set out in the Final Decision in relation to sage grouse protection. Because BLM did not adequately analyze this kind of sage grouse related data in its EA, it could not have made an informed decision with respect to the impacts upon sage grouse of the grazing system set out in the Final Decision. (AR027127).

In reversing, the IBLA again failed to apply—or even acknowledge—its rule that ALJ factual findings should be upheld if supported by substantial evidence. *See* AR010620–30. The IBLA's failure to follow its own precedents and determine whether the ALJ Decision was supported by substantial evidence is thus again arbitrary and capricious, requiring reversal.

Moreover, the IBLA relied on factual misstatements and non-record presumptions to overrule key aspects of ALJ Heffernan's findings. Regarding the findings that BLM did not know where sage-grouse habitats were on the DCA, for example, the IBLA stated:

> Judge Heffernan concluded that BLM did not know the location of sage-grouse nesting and brood-rearing areas in the Allotment because Staggs, a BLM RMS, stated he did not personally know the location of such areas. However, Staggs was not a BLM wildlife biologist and did not undertake the duties of a wildlife biologist or supervise wildlife biologists on the IDT that were involved in the decisionmaking process. BLM's wildlife biologists, not Staggs, were charged with the duty of locating sage-grouse use and habitat in the Allotment. While the wildlife biologists did not testify at the hearing, the results of their analysis are presented in the EA. Since we presume they did their jobs, we find they knew where sage-grouse nesting and brood-rearing areas were and assessed the likely impacts of the grazing proposal on those areas.

AR010623 (emphasis added).

This "presumption" that the wildlife biologists "did their jobs," "knew where" the sage-grouse habitats were, and "assessed likely impacts" is not supported by the record, since the biologists did not testify at hearing, and the EA itself did not disclose the locations of sage-grouse habitats or discuss potential impacts with specificity at all. *See* AR020782–83;

AR020844–46; AR020857–59; AR020863–66 (EA discussions). Moreover, the IBLA has

previously recognized that it may not simply rely on the self-serving assertions of BLM staff

when contradictory evidence is presented at hearing. "[I]t has never been the practice of this

Board to accept the conclusory opinions of BLM's experts as a proper basis for a decision in the

face of conflicting testimony." *Filippini Ranching Co. and Paris Ranch v. BLM*, 149 IBLA 54,

78 (1999). By relying on unwarranted presumptions instead of heeding the facts in the record,

the IBLA Decision is again unsupported by substantial evidence. *See Colo. Wild*, 435 F.3d at

1213 ("grounds upon which the agency acted must be clearly disclosed in, and sustained by, the

record"); *Olenhouse*, 42 F.3d at 1575 n. 25 ("inferences arbitrarily drawn" are reversible).

      The IBLA was also wrong in faulting the ALJ's findings that sage-grouse habitat and

populations have declined on the DCA. *See* AR010624. The IBLA said that both the 2004 and

2008 "EAs reported two leks," and the "report of a third lek at the time of the 2004 EA was from

a 'non-BLM document . . . attached to the 2004 EA." *Id.* But the ALJ specifically cited that

attachment to 2004 EA, and the IBLA cited no reason why a "non-BLM document" is not valid

evidence to assess the historical trend of sage-grouse habitats and populations. In fact, that "non-

BLM" document was CRM's own proposal for the DCA, which addressed the status and history

of sage-grouse on the allotment in some detail. *See* AR017403–18.

      Additionally, the entire record before the IBLA does in fact show a decline in sage-

grouse leks, which the IBLA simply ignored. The 1979 Randolph EIS stated that <u>two</u> active leks

were previously found on the DCA, AR021109, but the 2008 EA revealed that only <u>one</u> active

lek remained, and the other was inactive. AR020845. As explained in the 2006 Rich County SG

Plan—also in the record, but ignored by IBLA—the apparent trend of increasing sage-grouse

populations in Rich County reflected the results of more intensive monitoring than was previously done, AR021913–15, and leks are considered "inactive" when birds have been absent for at least three years. AR021908. That Plan also acknowledged that sage-grouse habitat is harmed by "incompatible livestock grazing," which it designated a "high" threat in Rich County. AR021961. The Plan was cited in the 2008 EA, but never discussed. *See* AR020778; AR020875. By wholly ignoring this record evidence supporting the ALJ's findings that the EA failed to adequately address sage-grouse declines, the IBLA Decision is again arbitrary, capricious, and unsupported by substantial evidence.

### C.     FRH Utah Standard 3.

Relatedly, the IBLA arbitrarily reversed the ALJ's findings and conclusions that BLM violated NEPA and the FRH regulations in failing to assess whether habitat needs for sage-grouse and other wildlife were being met on the DCA under Utah Standard Three. *See* AR027146–54 & AR027172 (ALJ Decision).

Standard 3 requires that "[d]esired species, including native, threatened, endangered, and special-status species, are maintained at a level appropriate for the site and species involved." AR027147 (citing Ex. B-48). BLM acknowledged that Standard 3 applies to wildlife, including sage-grouse, a BLM special status species. *Id.* As the ALJ found, BLM did not gather site-specific data on the adequacy of vegetative cover or habitats needed by sage-grouse, relying instead on the allotment-wide "assumption" that wildlife habitat conditions near sage-grouse nests complied with Standard Three. AR027147–49. Yet BLM's own monitoring data found less native grasses and forbs than needed for sage-grouse habitats. AR027153–54. Judge Heffernan held that "BLM was under an obligation, based upon its own policy emphasis upon sage grouse

protection, to assess the 'habitat connected' circumstances of sage grouse on the allotment under the purview of Standard 3." AR027149. He concluded: "With respect to the condition of wildlife species habitats, BLM failed completely to observe and comply with Utah Standard 3. BLM failed to take the requisite 'hard look' in the EA at the impacts of lower grass percentages than were actually called for in its own [ecological site descriptions]." AR027172.

The IBLA again improperly disregarded Judge Heffernan's factual findings in reversing. *See* AR 010654-58. Despite the fact that no BLM biologists testified, the IBLA repeated BLM's assertion that "there obviously was a wildlife biologist . . . involved in the process," and accepted BLM's assumption that, because it determined upland and riparian areas were "functioning," that meant "all wildlife species dependent on such areas would be maintained at levels appropriate for the sites and species involved," and "wildlife habitat needs would be met." AR010656-57. Without even discussing the ALJ's findings that sage-grouse are a BLM special status species and BLM's acknowledgement that sage-grouse have specific habitat requirements, the IBLA further simply cited BLM's post-hearing brief to conclude: "[W]e find no requirement for BLM 'to identify specific wildlife. . . species, to establish how many of each species should be on the allotment, and to assess whether these targets are being met." AR010657.

IBLA's reversal is again arbitrary and capricious, and contrary to NEPA and the FRH regulations. BLM has an unequivocal mandate to determine whether land health standards are being met, and if they are not, whether livestock grazing is a cause. *See* 43 C.F.R. § 4180.1. BLM cannot assess land health standards by assuming, without supporting evidence, that those standards are met. And BLM has a NEPA duty to take a "hard look" at potential impacts on special status species such as sage-grouse, as numerous court decisions have held—including the

*Salazar* decision cited by the ALJ, which the IBLA disregarded. *See Salazar,* 843 F.Supp.2d at 1126 (cited by ALJ); *see also Or. Natural Desert Ass'n v. Jewell*, 840 F.3d 562 (9th Cir. 2016) (reversing where BLM EIS failed to adequately analyze sage-grouse winter habitats); *W. Watersheds Project v Abbey,* 719 F.3d 1035 (9th Cir. 2013) (BLM NEPA analysis must analyze site-specific sage-grouse habitats). By upholding BLM's unsupported determination that Standard 3 was being achieved, the IBLA again lacked substantial evidence and violated NEPA and the FRH regulations.

### D.      Upland Impacts

ALJ Heffernan also held that BLM's 2008 EA "le[ft] completely unassessed the important issue of radiating grazing impacts from . . . new troughs," finding that "BLM arbitrarily concluded that there would be no measurable impacts from the new troughs," and "failed to analyze and discuss such impacts with respect to the areas surrounding the troughs." AR027129–32. He found "factually unsupported" BLM's assumption that it could "move a herd from riparian areas to upland areas and that there would be no measurable impacts." AR027130–31. Further, the ALJ found that "BLM's 'unmeasurable' conclusion is rebutted by both BLM's own data and by [WWP's] data, and these site-specific impacts should have been more fully analyzed in the EA for BLM to have rendered an informed decision." AR027132.

The IBLA conceded that "BLM did not focus on grazing use in the immediate vicinity of the troughs." AR010631. But it found this forgivable, because "BLM indicated it would be difficult to quantify the numbers of livestock that would relocate to the [vicinity] of the new troughs," AR010632, and held BLM is not required to engage in "crystal-ball inquiry" to

"predict to what extent grazing use attributable to the new troughs is likely to measurably impact the upland areas." AR010635.

The IBLA also faulted Judge Heffernan for failing to "give any weight to the testimony of Leonard, an undisputed expert in range [management] systems" who "testified that he has personally observed similar situations in which the increased upland use was in fact not measurable." AR010633. Based on this anecdotal evidence at hearing, and despite the lack of any similar discussion or justification in the EA, the IBLA held that BLM "fulfilled its NEPA obligation and took a reasonably 'hard look' at likely impacts attributable to the new troughs." AR010635.

Yet again, the IBLA failed to follow its rule that ALJ findings should not disturbed if they are supported by substantial evidence; and its pronouncement that BLM is not required to engage in "crystal-ball inquiry" disregards the commands of NEPA that agencies must take a "hard look" at site-specific impacts of proposed decision. The hearing evidence, and ALJ Heffernan's findings, identified specifically that new water troughs can create site-specific livestock impacts in upland areas that previously did not receive intensive grazing use, as documented in scientific literature. AR027129-32.

Moreover, BLM's stated purpose in the Duck Creek EA was to rectify grazing damage to riparian areas. Considering that the new uplands troughs were the only action BLM implemented to discourage livestock from using riparian areas, BLM had to evaluate what the adverse impacts of that solution might be, including on sage-grouse and other habitats. And by accepting Leonard's anecdotal post-hoc explanation to overcome the EA's lack of analysis, IBLA violated NEPA by excusing BLM from its duty to rigorously and scientifically analyze and disclose

potential impacts for public review in its NEPA documentation. *See Native Ecosystems Council v. U.S. Forest Service*, 428 F. 3d 1233,1241 (9th Cir. 2005) (hard look must discuss adverse impacts, not just a "brush-off of negative effects").

### E.   Cumulative Impacts

NEPA requires BLM to analyze the cumulative environmental impacts of a proposed action.  40 C.F.R. §§ 1508.7; 1508.25(a)(2). "Cumulative impacts can result from individually minor but collectively significant actions taking place over a period of time." *Utahns for Better Transp. v. U.S. Dep't of Transp.*, 305 F.3d 1152, 1172–73 (10th Cir. 2002), *as modified on reh'g,* 319 F.3d 1207 (10th Cir. 2003) (citing 40 C.F.R. § 1508.7). A reviewing court will "examine the administrative record, as a whole, to determine whether the [agency] made a reasonable, good faith, objective presentation of those impacts sufficient to foster public participation and informed decision making." *Fuel Safe Washington v. Fed. Energy Regulatory Comm'n*, 389 F.3d 1313, 1331 (10th Cir. 2004) (internal citations and quotations omitted).

Here, BLM's 2008 EA did not even attempt to analyze the cumulative impacts of projects on the DCA's intermixed private and state lands along with the new grazing system, pipeline, water troughs, and fencing adopted in the 2008 Decision. AR027137–38. As the ALJ found, those projects include vegetation manipulation treatments, fencing, and water developments, all of which may impact wildlife habitats, including sage-grouse habitat. AR027136–38. "In a case of this complexity and magnitude," Judge Heffernan held that BLM's failure to discuss and analyze these cumulative impacts violated NEPA. AR027139.

In reversing, the IBLA acknowledged that the EA "did not expressly consider such activities in its assessment of cumulative impacts," but held that impacts from projects on the

permittees' private lands were "necessarily" accounted for in BLM's analysis of the "baseline environmental condition," "were fully accounted for as part of the existing environment," and "WWP offers nothing that undermines this conclusion." AR010642-43. And the IBLA upheld BLM's assumption that, since it did not "expect[] [grazing] to affect wildlife habitat . . . to a measurable degree," the proposed action "would not contribute to any cumulative impact to sage-grouse or other wildlife." AR010641 (internal quotations omitted).

This again mischaracterizes the hearing evidence and disregards the ALJ's findings, while accepting BLM's unsupported assertions over the evidence presented in the record. The IBLA's ratification of BLM's failure to analyze the reasonably foreseeable cumulative impacts was thus arbitrary, capricious, and contrary to NEPA. As the ALJ correctly held, BLM's failure to discuss and analyze cumulative impacts violated NEPA, which requires a much more detailed cumulative impacts analysis. AR027193, *citing W. Watersheds Project v. Bennett*, 392 F.Supp.2d 1217, 1223 (D. Idaho 2005).

E.    **Range of Alternatives**

NEPA requires federal agencies to "study, develop, and describe appropriate alternatives to recommended courses of action." 42 U.S.C. § 4332(E). This requirement applies to the preparation of both EISs and EAs. 40 C.F.R. § 1502.14; 40 C.F.R. § 1508.9(b). Such analysis must "not simply pay 'lip service' to them while proceeding along a pre-determined course." *Metcalf v. Daley*, 214 F.3d 1135 (9th Cir. 2000) (remanding EA which was "as an exercise in form over substance" to authorize a pre-ordained determination).

The Tenth Circuit applies a "rule of reason" to determine whether the range of alternatives a federal agency considered, "and the extent to which it discuss[ed] them," was

adequate. *Utahns for Better Transp.*, 305 F.3d at 1166. A reasonable alternative is one that is "non-speculative . . . and bounded by some notion of feasibility." *Id.*

BLM's stated purpose here was "to implement changes in livestock grazing to meet Rangeland Health Standards on some of the riparian areas within the Duck Creek Allotment." AR020779. However, the 2008 EA analyzed only two alternatives, both having the same grazing system, terms and conditions, and management objectives, and both of which rely on the new upland troughs to draw livestock away from riparian areas. AR027133. The ALJ held that BLM violated NEPA in not considering a reduced grazing alternative, citing numerous federal court cases. AR027133–36.

Reversing, the IBLA accepted BLM's refusal to analyze a reduced grazing alternative, reasoning that "fewer livestock would . . . still focus use on riparian areas and would have a similar effect" without change in duration of livestock through a grazing rotation system. AR010552. "[R]educed grazing would not redirect grazing use away from riparian areas." AR010645. Thus, "[w]e find no error in BLM not pairing a reduced grazing alternative with its rotational grazing system and related measures." AR010646-47.

IBLA's finding of "no error" is plainly erroneous and must be reversed. A reduced grazing alternative along with rotational grazing that redirected livestock away from riparian areas was neither speculative nor unfeasible. As ALJ Heffernan correctly held, while BLM is not required to <u>adopt</u> such an alternative, it is required to <u>analyze</u> it in order to have a legally sufficient EA. The IBLA's reliance on *W. Watersheds Project v. Bureau of Land Mgmt.*, 721 F.3d 1264, 1275–76 (10th Cir. 2013) is inapplicable to this alternative, since it addressed consideration of a "no grazing" alternative precluded by the applicable land use plan, not

whether reduced grazing alternatives are proper to meet FRH requirements and NEPA's commands, as the ALJ correctly noted. AR027134–35, *citing W. Watersheds Project v. Rosenkrance*, No. 4:09-cv-0298-EJL (D. Idaho Jan. 5, 2011) (ECF No. 37).

## VI.   WWP IS SEVERELY PREJUDICED BY THE IBLA DECISION.

Based on the foregoing errors, the Court must reverse the IBLA Decision, because it severely prejudices WWP. *See Prairie Band of Pottawatomie Nation v. Fed. Highway Admin.*, 684 F.3d 1002, 1008-10 (10th Cir. 2012) (discussing the application of harmless error in the context of NEPA compliance).

As the record reflects, and the accompanying Carter and Ratner Declarations further establish, grazing has been ongoing under the 2008 Decision on the DCA, and has continued to cause severe ecological impacts which WWP has continued to monitor and document—even publishing a paper on the ecological degradation in the peer-reviewed livestock industry journal, *Rangelands*. *See* Ratner Decl., Exh. 1 (copy of paper). Moreover, the IBLA Decision has set precedent erecting an insurmountable bar for WWP or others seeking to present their own monitoring evidence to challenge BLM grazing decisions. Ratner Decl., ¶¶ 26–30. Reversal is required both to rectify the damaging grazing continuing on the DCA, to comply with NEPA and FRH requirements, and to set aside IBLA's erroneous legal precedent. *See* Carter, Ratner Declarations.

## CONCLUSION

For the foregoing reasons, WWP respectfully prays that the Court reverse the IBLA Decision and BLM's 2008 Decision, FONSI, and EA; and remand with instructions for BLM to

prepare a lawful grazing decision for the Duck Creek allotment that complies with NEPA, FLPMA, and BLM's regulations.

     Dated: February 10, 2020          Respectfully submitted,

                                      */s/ Laurence J. Lucas*
                                      Laurence J. Lucas (ISB #4733) *pro hac vice*
                                      Megan Backsen (ISB #10490) *pro hac vice*

                                      Attorneys for Plaintiff

## CERTIFICATE OF COMPLIANCE

Pursuant to Federal Rule of Appellate Procedure Rule 32(a)(7)(C) and District of Utah Local Rule 7-4, I certify that this brief complies with the type-volume limitations of Rule 32(a)(7)(B)(i) and Local Rule 7-4 because it contains 12,893 words, excluding the parts of the briefs exempted by Rule 32(a)(7)(B)(iii).

                                      */s/ Laurence J. Lucas*
                                      Laurence J. Lucas (ISB #4733) *pro hac vice*

## CERTIFICATE OF SERVICE

I hereby certify that on this 10th day of February 2020, I filed the foregoing PLAINTIFF'S OPENING BRIEF and the accompanying DECLARATIONS OF JOHN CARTER AND JONATHAN RATNER (and the exhibit thereto) electronically through the CM/ECF system, which caused the following parties or counsel to be served by electronic means, as more fully reflected on the Notice of Electronic Filing:

Michael S. Sawyer
michael.sawyer@usdoj.gov
Attorney for Defendants

Rebecca J. Jaffe
rebecca.jaffe@usdoj.gov
Attorney for Defendants

Anthony L. Rampton
arampton@agutah.gov
Attorney for Defendant-Intervenors

Kathy A. F. Davis
kathydavis@agutah.gov
Attorney for Defendant-Intervenors

Jake M. Garfield
jgarfield@utah.gov
Attorney for Defendant-Intervenors

*/s/ Laurence J. Lucas*
Laurence J. Lucas  (ISB #4733) *Pro hac vice*