Laurence ("Laird") J. Lucas (ISB #4733) *Pro hac vice*
ADVOCATES FOR THE WEST
P.O. Box 1612
Boise, ID 83712
(208) 342-7024
llucas@advocateswest.org

Megan Backsen (ISB #10490) *Pro hac vice*
20 S. Wheeler St.,
Boise, ID 83705
(719) 207-2493
meganbacksen@gmail.com

Attorneys for Plaintiff

Joel Ban (UT Bar # 10114)
Ban Law Office P.C.
P.O. Box 118
Salt Lake City, UT 84110
Tel: (801) 532-2447
joel@banlawoffice.com

Local Counsel

**IN THE UNITED STATES DISTRICT COURT
DISTRICT OF UTAH, NORTHERN DIVISION**

| | |
|---|---|
| WESTERN WATERSHEDS PROJECT, <br><br> Plaintiff, <br><br> v. <br><br> INTERIOR BOARD OF LAND APPEALS & U.S. DEPARTMENT OF THE INTERIOR, <br><br> Defendants, <br><br> and <br><br> STATE OF UTAH, <br>                   Defendant-Intervenor | No. 1:19-cv-00095-TS-PMW <br><br> **DECLARATION OF JOHN G. CARTER** |

I, John G. Carter, declare as follows:

1.      The following facts are personally known to me, and if called as a witness I would and could truthfully testify to these facts.

2.      I am a member of Western Watersheds Project (WWP), and have been a member since 2000. I also currently serve on the WWP Advisory Board.

3.      I live in Paris, ID, on a property called Keisha's Preserve. I began living at the Preserve full time in 2011, but began acquiring the property in 1993 to set it aside for wildlife, including greater sage grouse. Today, the Preserve is nearing 1,000 acres with over 800 acres set aside in conservation easements to preserve habitat.

4.      I am a professional scientific consultant, specializing in the ecology of the Interior West. I have substantial experience and expertise over the past 30 years in assessing and monitoring livestock grazing management systems and grazing impacts upon ecological values, including uplands, riparian, and aquatic systems. The testimony in this declaration is in regards to my experience and research on the Duck Creek allotment in Rich County, Utah,

5.      I obtained a Bachelor of Mechanical Engineering from Georgia Institute of Technology in 1966 and Master of Business Administration from Georgia State University in 1972. For many years in the late 1960's and early 1970's, I worked as a professional engineer in the South.

6.      In 1980, I received my PhD in Ecology from Utah State University. I also served as a Teaching and Research Assistant in Plant Taxonomy, Plant Physiology and Botany at Utah State from 1976-80. Since receiving my PhD, I have published numerous articles and studies.

7.      Since 1980, I have worked as a professional consultant in the areas of ecology and biology in Utah, Idaho, and the surrounding region. During that time, I had an environmental

DECLARATION OF JOHN G. CARTER                                                                                                    2

consulting firm, Environmental and Engineering Solutions, EEC (EES), which served as an environmental consultant for industry, government, nonprofit organizations, and private citizens. I provided scientific expertise regarding human-induced impacts to watersheds and wildlife; and in design and implementation of corrective actions. My clients have included the Colorado Attorney General, Denver Water Board, National Park Service, Forest Service, PacifiCorp, Bonneville Pacific Power, Kennecott Corporation, Sun Oil, Phillips Petroleum, Sohio, Union Oil, Envirocare of Utah, Browning Arms, and Nucor Corporation. I terminated that consulting company in 2018.

8.  Through both my Ph.D educational program, and in the course of my consulting business since receiving my Ph.D., I have devoted substantial time in collecting, studying, and assessing scientific literature and data relating to livestock grazing management and its effects on plants, soils, watersheds and streams, I have extensively reviewed grazing management systems to assess their effectiveness; and I have helped design grazing management systems for clients. I also conducted numerous surveys and studies of my own, addressing various aspects of range management and the ecological impacts of grazing. I have published papers relating to my own work; and provided extensive scientific information and data to the Forest Service, BLM and other agencies or environmental organizations in the form of reports, comments, and analysis relating to livestock grazing management and grazing impacts.

9.  In 1996, I founded the nonprofit Willow Creek Ecology, Inc. ("WCE") and served as its President for several years. WCE was dedicated to (1) the conservation and preservation of wildlife and wildlife habitat and (2) the protection of public health and the environment in the Intermountain West, including the National Forests and public lands in Utah and Idaho. WCE worked to achieve its goals using scientific approaches.

10. In May 2001, WCE joined with WWP. From 2001 to 2010 I served as the Utah Director for WWP and also served on WWP's Board of Directors.

11. My work as WWP's Utah Director focused intensively in Rich County, Utah, because of its large and robust sage-grouse population and a landscape devoid of major infrastructure and human activity aside from livestock grazing, leaving large expanses of sagebrush intact. BLM NEPA decisions threatened to worsen the existing damage without adequate quantitative monitoring and while adopting unproven upland water troughs and rotation grazing systems. Because of this, I began a long-term data collection and monitoring project on the Duck Creek allotment in Rich County in 2001.

12. In 2004, BLM was intended to implement an intensively managed grazing regime modeled after the "Holistic Management" trumpeted by Allan Savory. This management regime proposed to maintain forage for livestock while also protecting the land. We instituted our monitoring efforts on Duck Creek in an effort to independently judge the effect of that grazing regime. The project consisted of visiting the Duck Creek allotment during spring and fall each year to set utilization cages, observe conditions, measure habitat structure with a focus on greater sage grouse cover requirements, determine the impacts of upland water developments, and ultimately calculating the amount of vegetation removed by grazing in upland and riparian areas (the "utilization" percentage).

13. Between 2005 and 2008 the data I collected on the Duck Creek allotment was used in the administrative appeal of BLM's 2008 Duck Creek EA and Final Decision. That data included (1) utilization, (2) production, (3) cover. I testified extensively about the data I collected before ALJ Heffernan with the Office of Hearings and Appeals.

14. After leaving WWP in 2010, I continued monitoring and research on the Duck Creek allotment as an interested public. I did this due to a need for quantitative assessments of the outcomes of systems such as the upland water developments and deferred rotation grazing system implemented on the allotment in 2010.

15. In 2012, I started the Yellowstone to Uintas Connection, a 501c3 non-profit to address the regionally significant wildlife corridor that connects the Yellowstone ecosystem to the Uinta Wilderness and Southern Rockies. Rich County is an important area within this corridor and of course, includes the Duck Creek allotment. I now am an Interested Public on the Duck Creek allotment through the Yellowstone to Uintas Connection. The data collected and correspondence with BLM since March, 2012 are on behalf of the Yellowstone to Uintas Connection.

16. Myself and the current WWP Utah Director, Mr. Jonathan Ratner, have collected various data on the Duck Creek allotment since the implementation of the upland water developments and grazing system in 2010. Mr. Ratner and I have collected data on: (1) upland utilization and productivity; (2) riparian utilization and productivity; (3) stream bank alteration from livestock trampling; and (4) greenline and meadow stubble heights from 2005 to 2018.

17. Jonathan Ratner and I have implemented a water quality monitoring program in Utah, and specifically, in Rich County. Water quality data we have collected include E.coli and temperature in a number of streams in Rich County. These data demonstrated exceedances of State of Utah water quality criteria and have been used by the State of Utah to list several streams as water quality impaired. The original study was completed in 2009.

18. In 2004 and again in 2012, Mr. Ratner and I collected sediment core samples in cutthroat trout habitat in tributaries to the Bear River in Idaho and Utah, including allotments in

Rich County. These data showed that livestock grazing-induced sediment has impaired spawning gravels for native cutthroat trout, lowering reproductive success. In particular, this year (2020), we plan to do sediment core sampling in the Three Creeks project area in Rich County as well as in other tributaries of the Bear River we previously sampled. This is a time-intensive process because we monitor several locations in Rich County alone, as well as many in northern Utah, and we can only cover about one to two locations in a day. This year, we have several sites we won't be able to sample because they are too far away.

19. These studies continue today. I returned to the Duck Creek allotment study area in 2018, once to set riparian utilization cages, and once with the Salt Lake BLM Field Office Manager and Aquatic Specialist. Throughout 2018, I continued to press for the BLM to participate in our monitoring or at least observe our monitoring. To wit, in 2018 I invited BLM to merely attend the placement of our riparian utilization cages for that year and to observe the residual from the previous year of grazing. BLM refused all requests and I believe this is due to their desire to maintain deniability of our data. The vast difference in residual riparian vegetation in grazed areas compared to the ungrazed areas in our utilization cages are clear to any who wish to see. Use remains near 100% each year compared to BLM's criteria of 50%, which itself is nearly twice the scientifically recommended level by agency scientists.

20. I continue to make annual visits to the Duck Creek allotment to observe conditions. The last visit was in May, 2019. During that visit, I observed the continued lack of spring growth of grasses. Yet BLM, in spite of range science recommendations and BLM's own Randolph Management Framework Plan (MFP) that recommends later turn-in (June or July) of livestock to protect and sustain native bunchgrasses such as bluebunch wheatgrass, BLM continues to allow turn-in of livestock in early May. During this trip—which was attended by

Mr. Erik Molvar of WWP, Jason Christensen of Y2U and Kandis Christensen of Y2U—we observed that the new water troughs installed in 2009 did not have wildlife escape ramps and the carcass of a sage grouse was found in one of them. Riparian exclosures were in disrepair and one spring we observed looked like a backhoe excavated it, but it was hoof shear from cattle, something we have reported over the years with no action to correct the problem. Springs and riparian areas in the Duck Creek allotment remain sacrifice areas to livestock and I predict will be lost as climate change worsens.

21. I was WWP's lead staff member in the litigation brought over the Duck Creek allotment and numerous other BLM grazing allotments managed by the Salt Lake Field Office, *WWP v. Carpenter*, No. 2:02-cv-0352-PGC (D. Utah). In April 2005, the Court approved settlement of that case. *Id.,* ECF Nos. 98–99. Under the 2005 Settlement, BLM agreed to revise the 1980 Randolph MFP and other northern Utah land use plans, and prepare an EIS "to undertake a comprehensive review of livestock grazing and all other multiple uses on the public lands managed" by BLM's Salt Lake Field Office, including the Duck Creek allotment. BLM also promised to begin the EIS in 2005 and complete it by 2009. *Id.* at 2–3. BLM also committed to "employ open, public procedures to ensure that the public, including but not limited to Plaintiff and Intervenors, has full opportunity to provide BLM with perspectives, data, scientific literature and other input, so that BLM may consider and use such input" in its analysis and decision-making. *Id.*

22. Regrettably, BLM has not lived up to those promises in the *WWP v. Carpenter* settlement. It has not prepared a comprehensive EIS to address grazing management in the Salt Lake Field Office allotments (including Duck Creek allotment), and it has not replaced the badly outdated Randolph MFP. And as the record of the Duck Creek OHA hearing detailed—and ALJ

DECLARATION OF JOHN G. CARTER                                                                                                 7

Heffernan expressly found—BLM has refused to cooperate with me and WWP on sharing information and data to the goal of improving livestock grazing.

23. I have prepared several reports discussing my findings and conclusions regarding the data I have collected on the Duck Creek allotment, including the "Duck Creek Allotment Summary 2005 thru 2012" dated March 3, 2013 (2013 Report) which summarized data collected before and after the implementation of the upland water developments and grazing system. The 2013 Report provides an evaluation of the system, including photos, of any changes occurring as a result. This included analysis of the data collected by Dr. Catlin, Mr. Ratner and myself during those years.

24. In a 2017 paper in the *Rangelands* journal, a publication of the Society of Range Management, I and my co-authors described the effects of upland water developments and a rotation grazing system similar to Savory's time-controlled system in the Duck Creek allotment based on 8 years of quantitative data collection. BLM made claims that reduced use in riparian areas (used as brood-rearing for sage-grouse) and no increased use by livestock in uplands justified renewing the grazing permits with these additional water troughs and rotation grazing system. Our study refuted these claims. We found no reduction in use by livestock in riparian areas, while use became extreme in uplands. This makes the current degraded state even worse. The uplands are used by sage-grouse for nesting habitat.

25. As I have for many years now, I will continue visiting the Duck Creek allotment to observe its conditions, and conduct additional monitoring of livestock impacts and fish and wildlife habitats. I plan to return to the Duck Creek allotment, and Rich County more generally, in spring 2020, and again in September or October 2020 following the livestock grazing season. I want to redo these line-intercept data points.

26. To date, starting in 2007, we have approximately 40,000 measurements. I want to go back and get another data set before beginning the process of summarizing the data and writing a paper about it. This will have been 10 years since the implementation of the upland water developments and grazing system in 2010.

27. Through IBLA's 2017 Duck Creek Decision, BLM is sanctioning further livestock-driven degradation of the Duck Creek allotment. In affirming BLM's 2008 Duck Creek Decision and EA, the IBLA has allowed BLM's unscientific and excessive livestock grazing to degrade the Duck Creek allotment and its dependent wildlife. The IBLA Decision, and the BLM grazing management it approved, injures and harms my scientific, aesthetic, spiritual, recreational, professional, and other interests in the preservation of this allotment, its species, and the value it adds as a wildlife corridor. It negates the investment of time and money I have spent on Kiesha's Preserve to protect, restore and preserve habitat for sage-grouse and many other species as the northern Utah and SE Idaho populations of sage grouse are part of the same regional population.

28. The IBLA's September 2017 Decision further harms me personally by rejecting my expertise and findings, which were detailed in the lengthy OHA hearing and found by ALJ Judge Heffernan. IBLA asserted that my work, and my colleague Dr. Jim Catlin, "represents nothing more than their personal observations of rangeland conditions at the various times they visited the allotment. They could not be properly considered experts in rangeland management." Here, IBLA directly insults my education and experience.

29. As noted above I have a PhD in ecology including training in plant physiology, taxonomy and botany. I have spent over three decades studying range science through conferences, textbooks, scientific papers, consulting with other experts and applying that

DECLARATION OF JOHN G. CARTER                                                                                              9

knowledge to on-ground monitoring of grazed and ungrazed lands. I have yet to meet a so-called "range management professional" who is not employed by, or dependent on public lands grazing. These are the conflicted "experts" IBLA would defer to. I don't see these experts doing the quantitative data collection I have done.  I don't see them applying the sound range and ecological science-based criteria such as proper utilization, rest, determination of forage availability and rate of consumption by livestock in order to set sustainable stocking rates. As a part of the Department of Interior along with BLM, I find IBLA to be biased and unwilling to be educated as to the conditions on the ground, the degradation, improper application of range science principles, overstocking, and displacement of wildlife thru habitat alteration and degradation.

30. Because I am not an individual party to this case, I am relying on WWP to defend my professional integrity and reputation against the IBLA's unfounded characterizations denigrating my expertise. A ruling by this Court reversing the IBLA Decision is needed to remedy the harm that I have suffered—and WWP, as the party I was acting for in my monitoring, analysis and testimony about the Duck Creek allotment—from the IBLA Decision.

31. A ruling by the Court that IBLA's Duck Creek decision is arbitrary, capricious, contrary to the law, and a remand back to the BLM for a decision that protects the Duck Creek allotment from further degradation will help ensure that BLM fully and fairly discloses the impacts of its management activities to the public and follows the best available science, and will prevent irreparable harm to the Duck Creek allotment and my own interests, as well as those of other WWP members.

      I declare under penalty of perjury that the foregoing is true and correct. Executed this 4th day of February, 2020 at Paris, Idaho.

*/s/ John G. Carter*

_____

John G. Carter