Laurence ("Laird") J. Lucas (ISB #4733) *Pro hac vice*
ADVOCATES FOR THE WEST
P.O. Box 1612
Boise, ID 83712
(208) 342-7024
llucas@advocateswest.org

Megan Backsen (ISB #10490) *Pro hac vice*
20 S. Wheeler St.,
Boise, ID 83705
(719) 207-2493
meganbacksen@gmail.com

Attorneys for Plaintiff

Joel Ban (UT Bar # 10114)
Ban Law Office P.C.
P.O. Box 118
Salt Lake City, UT 84110
Tel: (801) 532-2447
joel@banlawoffice.com

Local Counsel

**IN THE UNITED STATES DISTRICT COURT**
**DISTRICT OF UTAH, NORTHERN DIVISION**

| | |
|---|---|
| WESTERN WATERSHEDS PROJECT,<br><br>Plaintiff,<br>v.<br><br>INTERIOR BOARD OF LAND APPEALS &<br>U.S. DEPARTMENT OF THE INTERIOR,<br><br>Defendants,<br><br>and<br><br>STATE OF UTAH,<br>Defendant-Intervenor | No. 1:19-cv-00095-TS-PMW<br><br>**DECLARATION OF**<br>**JONATHAN B. RATNER** |

DECLARATION OF JONATHAN B. RATNER                                                                                    1

I, Jonathan B. Ratner, declare as follows:

1. My name is Jonathan B. Ratner and I am more than 18 years of age. I presently live in Pinedale, Wyoming, where I have lived since 2003. The following facts are personally known to me, and if called as a witness I would and could truthfully testify to these facts.

2. I am a member of Western Watersheds Project (WWP), and have been a member since 2002.

3. I am also employed as WWP's Wyoming, Utah, and Colorado Director.

4. Prior to my employment with WWP, I was a professional biologist with four years of experience providing contract services for the BLM, USDA Forest Service, Wyoming Department of Game and Fish, the University of Wyoming, and the Interagency Grizzly Bear Study Team. My research focused on large forest carnivores, including grizzly bear, wolverine, lynx, and marten.

5. As both staff and a member of WWP, I rely on the organization to represent my personal and professional interests in maintaining, protecting, and restoring the public lands and resources of the public lands across the West, including in Utah, Wyoming and Colorado. I joined WWP and continue to support it because, of the dozens of organizations that I have worked with, WWP is by far the most effective at protecting the ecosystems of public lands and the species that depend upon it, like sage grouse, bighorn sheep and others. In my opinion, the harms caused by public lands livestock grazing to soils, native habitats, streams, and fish and wildlife populations would never be addressed in any meaningful fashion were it not for WWP.

6. In my capacity as WWP's Wyoming, Colorado, and Utah Director, I oversee and implement all of WWP's conservation programs in these three states. My responsibilities include monitoring livestock grazing impacts on Forest Service, Bureau of Land Management lands and

National Park Service (NPS), and conducting research on the impacts of land management decisions on wildlife and ecosystem function throughout the states I cover. This encompasses a variety of tasks, including monitoring the implementation of and compliance with livestock management plans or other livestock management requirements, monitoring annual use limits imposed by a grazing permits terms and conditions (stubble height, utilization rates for uplands and riparian areas, willow utilization rates, stream-bank alteration, etc.), and conducting aerial surveys and photography to document watershed degradation in the form of erosion, gullying, headcutting, hummocking, excessive bare ground, and vegetation alteration patterns.

7. As part of my work with WWP, I collect a large quantity of data each field season by conducting surveys, including bird habitat surveys, range condition surveys, forage production surveys, riparian condition monitoring and assessments, and fisheries habitat surveys. These surveys occur on public lands in Utah—including the Duck Creek allotment, as detailed further below—and in Wyoming and Colorado.

8. In order to perform my duties, I keep up to date with current science in the areas of range management, species conservation, water quality, fisheries biology, soils and erosion processes, hydrology, botany and other fields. This also includes research on the impacts of land management decisions, such as oil and gas development, habitat fragmentation, road construction, logging and livestock grazing.

9. I also attend training courses regularly in order to keep up to date with changes in the protocols as well as to insure I am refreshed in the procedures. I regularly attend training courses conducted by the federal agencies in the standard monitoring protocols used by the agencies. These include:

DECLARATION OF JONATHAN B. RATNER                                                              3

    a. Multiple Indicators Monitoring – This quantitative methodology is used for the collection of a wide array of both short-term and long-term parameters that define riparian conditions.
    b. Proper Functioning Condition – This qualitative method is used for rapid assessments of general stream conditions.
    c. Interpreting Indicators of Rangeland Health – This method collects a wide array of quantitative and qualitative data in order to assess upland range condition.

10. In addition, I have found the use of Geographical Information System ("GIS") analysis invaluable in carrying out my duties. GIS analyses provide important information and patterns which would not be readily available through other means. Since 2003, I have taken numerous courses sponsored by ESRI to expand my knowledge of GIS, including an 8-hour training course entitled "Creating and Analyzing Surfaces using ArcGIS Spatial Analyst" in June 2009. I use GIS as part of my work on an almost daily basis. I estimate that I have used GIS analysis to create several hundred maps.

11. Due to the vast area I cover each field season, I spend a substantial portion of my time in the field. I spend approximately 100 nights each year camped out on the public lands. I conduct a large amount of fieldwork and spend an enormous amount of time on public lands in Utah, Colorado, and Wyoming each year.

12. I have a deep personal and professional interest in restoring healthy sage-grouse populations around the west, including in northern Utah. To that end I conduct sage-grouse habitat surveys including measuring habitat parameters such as sagebrush cover, residual grass height, bare ground, and species composition. I also search out sage-grouse and its signs wherever possible.

13. I have worked extensively within the Duck Creek allotment over the last 13 years. I first visited the area in 2007. Overall I have visited about 30 times. My most recent visit was on May 8, 2018 and I will be returning in April of 2020.

14. I have collected a wide range of data within the project area including aerial cow counts, riparian condition assessments and utilization monitoring, in order to assess grazing impacts and permit compliance.

15. In addition to monitoring grazing impacts and permit compliance, I conduct a water quality monitoring program on the Duck Creek allotment with Dr. John Carter. Specifically, I monitor water quality parameters such as e. coli contamination, dissolved oxygen, pH, turbidity, temperature, and salinity for compliance with state water quality standards. This program is particularly field-intensive because, for every site I monitor, I must collect five water samples within a 30-day period, each separated by a minimum of 24 hours. I have collected water quality data from Duck Creek and Southfork Sixmile Creek—two of the main streams originating on the Duck Creek allotment—from year-year. This data show high levels of E. coli contamination.

16. I have collected riparian habitat condition data on the Duck Creek allotment from year-year. This data shows the riparian areas, including seeps and springs, are severely degraded by livestock.

17. I have also collected sage grouse habitat condition data, livestock management information such as utilization, riparian impacts, trespass livestock and other aspects of permit compliance.

18. In 2017, colleagues and I published a paper in the Society for Range Management's peer-reviewed journal *Rangelands,* titled "Upland Water and Deferred Rotation Effects on Cattle Use in Riparian and Upland Areas," detailing our years of data collection and results on the Duck Creek allotment. A true and correct copy of that paper is attached hereto.

19. I am dismayed and deeply injured by my observations of the damage that livestock grazing has caused and is continuing to be caused to the Duck Creek allotment. Nearly all of the riparian areas that are accessible to livestock are severely degraded. Severe livestock utilization and physical impacts have resulted in poor vegetative conditions as well as degraded riparian habitat. In the uplands, the failure of the BLM to manage livestock grazing within the capacity of the land has resulted in the transformation of tall, native cool season bunchgrasses—a critical component of a functional ecosystem and wildlife habitat—to short stature "increaser" (i.e., less desirable) species and non-native and invasive species. The history of abusive grazing practices, that continue to present, have caused significant soil loss, gullying and stream downcutting.

20. On September 12, 2008, the BLM issued a Final Decision and supporting Environmental Assessment (EA) and Finding of No Significant Impact (FONSI) for the Duck Creek allotment that authorized the same level of grazing that had previously caused extensive damage. Because of numerous deficiencies, on October 28, 2008, WWP appealed BLM's Final Decision, EA and FONSI to the Department of Interior's Office of Hearings and Appeals, Hearings Division.

21. On May 16, 2013 after the longest grazing hearing in the history of the Office of Hearings and Appeals (OHA), at which Dr. Carter and others presented detailed evidence of WWP's monitoring and investigations of the Duck Creek allotment, Administrative Law Judge (ALJ) Heffernan issued an order reversing the BLM's Final Decision, FONSI, and EA for the Duck Creek allotment. ALJ Heffernan found that BLM violated NEPA and BLM's grazing regulations in numerous respects, including by unfairly excluding WWP from the permit process, favoring the permittees, and disregarding the extensive data that WWP (led by Dr. Carter) had

collected showing excessive grazing utilization and damage to the allotment. ALJ Heffernan's order would have required the BLM to reassess the damage caused by livestock grazing to the Duck Creek allotment and conduct a full, open, and NEPA-compliant process for issuing a new grazing decision on the allotment.

22. However, on August 3, 2013, the Interior Board of Land Appeals (IBLA) granted BLM a stay of ALJ Heffernan's order, allowing BLM's 2008 Final Decision to be implemented, and livestock damage to the Duck Creek allotment to continue unabated.

23. Over four years later, the IBLA issued its September 2017 Decision reversing ALJ Heffernan's order in its entirety. IBLA's Decision was based on numerous legal and factual errors, and approved ongoing excessive and improper livestock grazing on the Duck Creek allotment, that further causes injury to my interests and those of WWP due to the continuance of livestock grazing that is degrading springs and riparian habitat as well as upland sage grouse habitat.

24. The IBLA's Decision causes deep harm and injury to my personal interests in seeking the Duck Creek allotment improved in its habitat and ecological conditions, so that it can sustain the full suite of wildlife, fish and other ecological values it once supported, including as sage-grouse habitat. The IBLA's Decision has allowed BLM to perpetuate its excessive and unscientific grazing scheme on the Duck Creek allotment, causing further environmental degradation and harm to my interests, and to those of WWP as an organization, that can only be remedied by a decision from this Court reversing the IBLA and requiring BLM to conduct a new and lawful decision process to revise management of the allotment and allow it to begin recovery.

DECLARATION OF JONATHAN B. RATNER                                                              7

25. WWP as an organization, and I personally as a WWP member and employee, are committed to improving ecological conditions on the public lands. WWP, through its staff, board, members and volunteers, has particular interests, activities, and expertise in livestock grazing management and impacts. The Duck Creek allotment is only one example of many BLM grazing allotments where WWP has monitored habitat and ecological conditions, and participated at administrative hearings before the OHA to document livestock damage, seek improvements, and force BLM to comply with its duties and obligations under law, including NEPA, FLPMA, the Fundamentals of Rangeland Health (FRH), and other aspects of the BLM's grazing regulations.

26. The IBLA's September 2017 Decision, however, erects virtually insurmountable standards of proof that WWP must supposedly meet to challenge BLM grazing decisions for violations of NEPA, FRH, and the grazing regulations. WWP has received negative decisions in other recent OHA cases that cite the IBLA's Duck Creek Decision and acknowledge the fact that the Duck Creek Decision makes its effectively impossible for WWP to present its own monitoring data and science-based findings to challenge erroneous and unlawful BLM grazing decisions.

27. For example, I have reviewed one recent OHA opinion explained that the IBLA's Duck Creek Decision poses a nearly complete bar to prevailing before IBLA for conservation appellants, noting that although the appellants raised sufficient potential genuine issues of material fact, there was little point in appellants pursuing a hearing because, "[a]s the parties are aware, a party appealing a BLM grazing decision must carry an extremely high burden, as underscored by recent decisions of the IBLA. This is apparently so even when an appellant produces its own extensive firsthand monitoring data on an allotment. . . . the Appellants here

DECLARATION OF JONATHAN B. RATNER                                                          8

should be aware that the Duck Creek case [does] not bode well for [their] ultimate chances of prevailing before the [Interior Board of Land Appeals], regardless of the outcome in the Hearings Division." *Yellowstone to Uintas Connection v. BLM*, UT-W010-15-1, Motions for Summary Judgment Denied, at 16–17 (OHA, November 30, 2017) (emphasis added).

28. In my work as WWP's Wyoming, Utah, and Colorado Director, I have realized the importance of litigation as a tool to affect accountability. As such, I have filed somewhere around 30 appeals in OHA. However, the IBLA's Duck Creek Decision and the nearly complete bar it present to ultimately prevailing has dramatically curtailed my efforts to pursue administrative remedies within OHA.

29. Again, WWP's interests, and my own as a WWP member and employee, are harmed by the virtually impossible bar that the IBLA's Duck Creek Decision has set for WWP in attempting to use science and monitoring to challenge unlawful and inaccurate BLM's grazing decisions.  A decision from this Court reversing the IBLA's Duck Creek Decision is necessary to remedy these ongoing injuries.

30. If this Court does not reverse the IBLA's Duck Creek Decision and require BLM to undertake a new, valid and lawful process for adopting new management decisions for the Duck Creek allotment, my interests and those of WWP and its other members and staff will be injured by the continued livestock-caused degradation of ecological conditions on the Duck Creek allotment that I and others have personally witnessed and documented there. A decision by the Court reversing the IBLA is necessary to remedy those ongoing injuries.

//

I declare under penalty of perjury that the foregoing is true and correct.  Executed this 8th day of February, 2020 at Pinedale, Wyoming.

_____
Jonathan B. Ratner